**DALLAS BUILDING AND CONSTRUC-
TION TRADES COUNCIL, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent,**

**Dallas County Construction Employers
Association, Inc., Intervenor.**

No. 21057.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 17, 1967.

Decided April 23, 1968.

Mr. David R. Richards, Dallas, Tex., for petitioner.

Mr. Allen J. Berk, Attorney, National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Gary Green, Attorney, National Labor Relations Board, were on the brief, for respondent.

Mr. William L. Keller, Dallas, Tex., with whom Mr. George Allen Butler, Dallas, Tex., was on the brief, for intervenor.

Messrs. Louis Sherman and Laurence J. Cohen, Washington, D. C., filed a brief on behalf of Building and Construction Trades Department AFL-CIO, as amicus curiae.

Before PRETTYMAN, Senior Circuit Judge, and McGOWAN and ROBINSON, Circuit Judges.

McGOWAN, Circuit Judge:

This judicial review proceeding under the National Labor Relations Act, 29 U.S.C. § 151 et seq., presents primarily a problem of the relationship between the construction industry proviso of Section 8(e), on the one hand, and Section 8(b) (7) (A), on the other. The former makes valid an agreement in the construction industry relating to the contracting or subcontracting of work, which agreement might otherwise fall afoul of the Section's ban on secondary restraints. Section 8(b) (7) (A) prohibits the picketing of an employer for the purpose of compelling recognition of a labor organization where another union is already lawfully recognized and when representation issues are in a state of statutory repose. The Board here held in effect that the mere lawfulness of a proposed agreement under Section 8(e) does not conclude the question of whether picketing to get it under the circumstances recited in Section 8(b) (7) (A) may be an unfair labor practice. We think that that position comports with the scheme of the Act, and that the Board did not err in finding a violation of Section 8(b) (7) (A) to be shown by this record.

I

Petitioner, Dallas Building and Construction Trades Council [Council], is a labor organization whose membership includes some twenty local craft unions in the construction industry in Dallas. Dallas County Construction Employers' Association, Inc. [Association], the charging party before the Board and the Intervenor in this court, is a collective bargaining agent for its general contractor and subcontractor members, who include Henry C. Beck Co., George Bock Construction Co., Hyatt Cheek Builders-Engineers, and Robert E. McKee General Contractors, Inc. The Council is not the authorized bargaining agent of any employees. The Association, however, has collective bargaining agreements directly with the local craft unions, which, in turn, are the recognized but not certified representatives of their member employees.

Although the Association had, in its earlier separate negotiations with several of the locals, uniformly and successfully opposed proposals to include subcontract-

ing clauses,[1] the Council proposed to the Association in July, 1966, an agreement restricting subcontracting to employers who had agreements with the appropriate Council-affiliated local. The proposed contract also contained clauses expressly disclaiming any intention on the part of the parties that the Council be recognized as a bargaining representative of the employees, and subordinating the contract to any present or future agreements with the contractors.[2] The Council threatened to picket if the agreement was not adopted, either singly or collectively, by Association members. When the Association refused to enter into such an agreement, the Council served a similar demand on each of the four general contractors, Beck, Bock, Cheek, and McKee; and, upon their failure to accept the proposals, picketed jobs those contractors had in progress during August, 1966.

A complaint was issued on September 9, 1966, charging the Council with an un-

fair labor practice in violation of Section 8(b) (7) (A).[3] The case was submitted to the Board on a complete stipulation of facts which waived a Trial Examiner's report. The Board concluded that the Council had violated 8(b) (7) (A) by threatening to picket and picketing with a recognitional object at a time when, under the Board's contract bar rules, no question of representation could be raised. Accordingly, it entered, and on cross-petition in this court seeks to enforce, an order requiring the Council to cease and desist from such conduct, and to post notices in customary places indicating its intention not to picket or threaten to picket for recognitional purposes.

II

Petitioner first tenders a statutory construction argument unaided by reference to Section 8(e) and deriving from the seeming lack of adverse interest between the Council and the local unions.[4]

---

1. The Board found from the stipulated facts that (1) at least five of the eight Council-affiliated locals that deal with the Association had sought subcontracting clauses in their price contract negotiations, (2) the Association had opposed such clauses, and (3) the locals had accepted contracts "containing other improvements in wages and working conditions."

2. "Whereas, it is understood that by this agreement the Contractor does not grant, nor does the Council seek, recognition as the collective-bargaining representative of any employees of the signatory contractor or of any other employer. * * *"
 * * * * *
 "It is agreed and understood that this contract shall in no way interfere with or supersede any present or future collective bargaining agreements to which the Contractor may be a party."

3. "(b) It shall be an unfair labor practice for a labor organization or its agents—
 * * * * *
 (7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or

select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
 (A) where the employer has lawfully recognized in accordance with this subchapter any other labor organization and a question concerning representation may not appropriately be raised under [section 9(c)] * * *."

4. Petitioner has also been at some pains to challenge the assertion that its picketing occurred at a time when representation issues could not be raised. It first says that there has been no showing that the locals are representing appropriate units of employees. It is true that the Board does not apply its contract bar rules to an inappropriate bargaining unit. Appallachian Shale Products Co., 121 N.L.R.B. 1160 (1958). The Board correctly answers, however, that craft units are traditional in the construction industry, and that the Council has not shown them to be inappropriate merely because their collective bargaining contracts with the Association often incorporate by reference certain provisions of national or international agreements. The Council's second contention is that the contracts with the locals are prehire agreements within the meaning of

The evil to be cured was, so it is said, blackmail picketing by one union attempting to wrest the representation of the employees from another weak, but recognized, union. But in this case, the Council's argument continues, there was no purpose to impair the representative status of the local unions.[5] Not only did the proposed agreement expressly disclaim any such result and subordinate itself to conflicting agreements between the Association and the locals, but the local unions did not consider the Council's conduct to interfere with their exclusive representation.

The Board's answer to this line of argument is that, while the legislation was initially motivated by blackmail picketing and inter-union warfare, the proscriptions of Section 8(b) (7) are not confined to that context. Congress in terms outlawed any picketing which sought to compel the employer to recognize and deal with a non-representative labor organization on the subjects which could substantially affect the working conditions of the employees. And the agreement proposed by the Council would have a significant impact upon some of the general contractors' employees. The Supreme Court has recognized that subcontracting is a mandatory bargaining subject;[6] and the Board has found in

this case that the adoption of the proposed agreement might vitally affect the number of employees hired by the general contractors. This is so because there are some types of work, laboring and millwrights' work, for example, which the general contractors sometimes subcontract and sometimes perform with their own employees. Without a union signatory agreement as proposed by the Council, the general contractors are likely to send out such work to relatively cheaper, non-unionized subcontractors rather than to perform it with their own higher-cost union employees.

It might be argued that, to the extent the Council's proposed agreement affects the job security of the general contractors' employees, that security is enhanced rather than undermined; and that, therefore, the agreement cannot be said to be contrary to the interest the employees have in choosing their own bargaining representative. The answer is, of course, that Section 8(b) (7) is not aimed solely at picketing by labor organizations which would, if recognized, act in a manner contrary to the interest of the employees. Whether or not the employees would be benefitted by the proposal of the outsider union is irrelevant if that proposal would bind the employer with respect to a matter about which the

Section 8(f) and therefore "shall not be a bar to a petition filed pursuant to [Section 9(c)]." This argument is refuted, however, not only by the absence of any proof that the contracts were executed before the locals' showing of majority status, but also by the fact that the agreements in effect are not the initial bargaining contracts between the parties. As the Board recently held in Bricklayers & Masons, No. 3 (Eastern Washington Builders), 162 N.L.R.B. No. 46, 1967 CCH NLRB ¶ 20,990 (1967):

[T]he legislative history of Section 8(f) reveals that Congress envisioned its pre-hire provisions as applying only to the situation where the parties were attempting to establish a bargaining relationship for the first time.

5. The Building and Construction Trades Department, AFL–CIO, in an *amicus* brief has advanced the thesis that Section 8(b) (7) is not offended merely by picket-

ing to secure an agreement relating to a subject of bargaining between the employer and the recognized union, but only when the picketing organization's object is the complete displacement of the recognized union. This contention goes beyond that of the Council, and does not appear to be compatible with the clear purpose of Section 8(b) (7) to prevent any infringement of the recognized union's representative status.

6. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L. Ed.2d 233 (1964). The Board makes clear, however, that it is immaterial to its view of Section 8(b) (7) whether the subject of the proposed agreement is mandatory or permissive, so long as it has a substantial impact upon the interests of the employees. The subcontracting in *Fibreboard* did not, of course, involve a union signatory clause.

recognized union may bargain as exclusive representative of the employees.

Nor is it so clear that the Council's proposal would invariably operate to the benefit of the general contractors' employees. The Board pointed out that those locals whose subcontracting proposals had been rejected by the Association had "accepted contracts with other economic benefits." If the Council's agreement were adopted, it would "take away an opportunity for the recognized unions to either bargain for or trade off subcontracting controls." This loss of leverage could substantially weaken the local unions at the bargaining table, an outcome which would be repugnant to the policy behind Section 8(b) (7).

Moreover, the Board's decision recognized that, while Section 8(b) (7) was primarily motivated by concern for the employees, it also reflects a solicitude for the predicament of the employer caught between two labor organizations, whether or not they are rivals. In the Board's words:

> [E]mployers are entitled to the protection of Section 8(b) (7) (A) against actions which tend to erode or even destroy their right to operate, unimpeded by outsiders' threats and picketing, under the collective-bargaining terms lawfully negotiated with their employees' representatives.

 The Association has already bargained with several of the local craft unions for the omission of subcontracting clauses from their agreements. Its members should be shielded from coercion on a second front by an organization with which they have no obligation to bargain. Because of the actual impact which the picketing and the Council's proposed agreement could have on the general contractors and some of their employees, the Council's disclaimer of intention to seek recognition is unavailing. Nor is the agreement saved by the subordination clause, for while it is true that the locals and employers remain free to adopt conflicting provisions or even to override the Council's agreement, that ability does not mitigate the immediate consequences which would flow from adoption of the agreement.

The Council argues that, even assuming the interests of some of the general contractors' employees are affected, such a primary effect is only incidental, and the principal thrust of the proposed agreement is secondary,[7] that is to say, the Council's concern is not for the employees of the generals but solely for those of the subs. Such a test—whether the picketing is *essentially* primary or secondary—is said to be required by inverse analogy to the proper standard under Sections 8(b) (4) and 8(e), which do not prohibit boycotts which are essentially primary and only incidentally secondary. See National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); Orange Belt District Council of Painters No. 48 v. NLRB, 117 U.S.App.D.C. 233, 328 F.2d 534 (1964). It is incongruous, the argument seems to be, that even though both sections contain the phrase "an object," 8(b) (7) prohibits picketing which is not *exclusively* secondary, while 8(b) (4) prohibits only conduct which is not *predominantly* primary. In short, an incidental primary *effect* should not constitute an *object* within Section 8(b) (7).

 The Board rejects this analogy, however, asserting that the pertinent inquiry under Section 8(b) (7) is not, as under Sections 8(b) (4) and 8(e), whether conduct is essentially primary or essentially secondary. Unlike the situation under those sections, where there is an affirmative statutory policy to protect and foster primary activity, there is under Section 8(b) (7) no corresponding affirmative policy in favor of picketing with even purely secondary purposes.

---

7. See Truck Drivers Union Local No. 413, etc. v. NLRB, 118 U.S.App.D.C. 149, 158, 334 F.2d 539, 548, cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964): "Union-signatory subcontracting clauses are secondary, and therefore within the scope of § 8(e), while union-standards subcontracting clauses are primary as to the contracting employer."

Therefore, there is no reason to overlook or sanction the "incidental" primary effect of picketing by unrecognized labor organizations, and that effect can legitimately be deemed an "object" of the picketing. In this the Board is supported by uniform precedents to the effect that Section 8(b) (7) picketing need have only "*an* object" which is recognitional; it is unlawful even if other major objectives are protected. See *e. g.*, National Packing Co. v. NLRB, 377 F.2d 800 (10th Cir. 1967); Dayton Typographical Union No. 57 v. NLRB, 117 U.S.App.D.C. 91, 326 F.2d 634 (1963).[8]

The Council's principal argument is that hot cargo agreements of the kind proposed by the Council are expressly legalized by Section 8(e),[9] and that therefore Congress could not conceivably have intended to outlaw the most natural means of achieving such agreements. Moreover, Congress intended by means of Section 8(e) to preserve the status quo of bargaining in the construction industry; and in 1959 "umbrella" agreements like the one proposed here were, as they are today, commonplace, for collective bargaining is traditionally conducted at several levels in the construction industry. The Board's decision, therefore, not only conflicts with the intent of Congress, but is incompatible with the practical realities of overlapping jurisdiction and contract coverage which characterize labor relations in the construction industry.

■ The Board's responses to these arguments are, however, convincing. First, there is no inconsistency between the Board's interpretation of Section 8(b) (7) and the purposes of Section 8(e). It simply does not follow from the fact that the agreement would be lawful if voluntarily adopted that a labor organization can employ illegal means to obtain it. Sections 8(b) (7) and 8(e) are aimed at wholly different problems. And the proscriptions of Section 8(b) (7) do not vary with the legality of the agreement sought. Picketing to obtain a wage agreement, for example, is no more lawful than picketing to obtain a hot cargo clause. Moreover, the Council is not aided by the unusual bargaining patterns of the construction industry. Even if area-wide subcontracting agreements have been adopted by multi-member bargaining units,[10] the Council has not shown that those agreements were obtained by picketing or that the labor organizations with which they were negotiated were not recognized within the meaning of Section 9.

### III

While judicial and administrative precedents are not conclusive of the issue in this case, they are consistent with the Board's decision. The Board relies

---

8. In this connection, the Board points out that its holding is really a fairly narrow one. Of course, only picketing is prohibited to the Council as a means of obtaining the union signatory contract. Moreover, even picketing is permissible if the coverage of the proposed contract is limited to the type of work which is never performed by the general contractors' own employees. According to the stipulation of facts, this would include work done by electricians, plumbers, asbestos workers, elevator constructors, and perhaps also roofers, plasterers and lathers.

9. "(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement * * * whereby such employer * * * agrees * * * to cease doing business with any other person

* * * *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and. an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction * * * *."

10. Actually, as the intervenor Association points out, the "umbrella" agreements to which the Council and *amicus* refer are identified in the stipulation as simply for use

in situations where the general contractor [operating over a wide area] does not have contracts on a local basis. Such agreements allow general contractors to operate under the same agreement as the local contractors are operating without the necessity of having to negotiate individual agreements with the various local unions.

most heavily on this court's decision in in Centralia Bldg. and Constr. Trades Council v. NLRB, 124 U.S.App.D.C. 212, 363 F.2d 699 (1966), which upheld the Board's determination that picketing by an unrecognized labor organization to obtain an agreement from the employer obligating him to pay his employees union wages and fringe benefits was recognitional and therefore in violation of Section 8(b) (7) (C). The Council attempts to distinguish that holding on the ground that the subject matter of the proposed agreement was wages and fringe benefits, which have a far greater primary impact on the general contractors' employees than does a union-signatory subcontracting clause. Indeed, the Board in Centralia had concluded that "with such an agreement in effect, very little would be left in the field of collective bargaining to a representative chosen by the employees * * *." 363 F.2d at 701. Centralia, however, does not mean that Section 8(b) (7) is violated only when the picketing union seeks to preempt the entire scope of interest of a recognized representative of the employees. The thrust of Centralia is that, so long as the union seeks a contract dealing with a subject relating to the conditions of employment of the general contractors' own employees, the picketing is recognitional within Section 8(b) (7).

In Centralia, moreover, the court emphasized that the employer "would have been required to throw open its records as to such payments that monthly inspection might be made" by the picketing union. Id. A similar obligation would of necessity have fallen upon the Association members under the subcontracting agreement proposed by the Council. This factor is important for it indicates that the employers' accession to the picketing union's demands would create a continuing relationship between the parties, with, as the Board put it, "the concomitant obligation to discuss implementation and compliance upon request, which naturally devolves upon the parties to a contract." A union involved in such inevitable day-to-day dealings could truly be said to have been recognized "as the representative" of the employees with respect to the subject matter of the agreement.

This element of a continuing contractual relationship also serves to distinguish several of the Board precedents relied on by the Council. In Houston Bldg. and Constr. Trades Council (Claude Everett Constr. Co.), 136 N.L.R.B. 321 (1962) and Local 259, UAW (Fanelli Ford Sales, Inc.), 133 N.L.R.B. 1468 (1961), for example, the Board found that picketing otherwise in violation of Section 8(b) (7) was not recognitional because its purposes were only to force the employers to do an act—in Claude Everett to pay union wages, and in Fanelli Ford to reinstate a discharged employee. In each decision the Board emphasized that the picketing labor organization sought no contractual ties or even any negotiations; the employer could have satisfied the demands and stopped the picketing without even talking to the union.

The Council claims that this case is controlled by the Board's decision in IBEW, Local 903 (Pass Development, Inc.), 154 N.L.R.B. 169 (1965). There the Board dismissed an 8(b) (7) (C) complaint against a union which had picketed a general contractor at the job site to force him to cease doing business with non-union subcontractors. The Trial Examiner's opinion—adopted by the Board—did contain some broad language to the effect that the picketing was principally subcontractor oriented. Nevertheless, the case is clearly distinguishable not only because the union did not seek to enter any continuing agreement with the employer, but also because the subcontracted work was not also performed by the general contractor's own employees.

Finally, two other cases relied upon by the Council—Bay Counties District Council of Carpenters, 154 N.L.R.B. 1598 (1965), enforced, 382 F.2d 593 (9th Cir. 1967); Building and Constr. Trades Council of Santa Barbara, 146 N.L.R.B. 1086 (1964)—are also distinguishable in

that both involved picketing by labor organizations which had already been recognized by the employers. In *Bay Counties* the employer had terminated its preexisting relationship with the union, but the Board correctly points out that Section 8(b) (7) (A) is aimed only at a labor organization's picketing to gain recognition for the first time, not picketing designed to retain its representative status.

The Board's order is sustained, and its enforcement granted.

It is so ordered.