415 F.2d 656
 72 L.R.R.M. (BNA) 2149
 LANE-COOS-CURRY-DOUGLAS COUNTIES BUILDING AND CONSTRUCTION
TRADES COUNCIL, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
Jens HORSTRUP, Respondent.
 Nos. 22169, 22169-A.
 United States Court of Appeals Ninth Circuit.
 Aug. 18, 1969.
 
 Paul T. Bailey, Portland, Or. (argued), Laurence J. Cohen, Washington, D.C., and Stephen M. Malm, of Bailey, Swink & Haas, Portland, Or., for petitioner.
 Glen M. Bendixsen (argued), Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D.C., Thomas P. Graham, Jr., Regional Director, Seattle, Wash., Robert J. Wiener, Officer-in-Charge, Portland, Or., for respondent.
 Riddlesbarger, Pederson, Brownhill & Young, Eugene, Or., for respondent Horstrup.
 Louis Sherman, Laurence J. Cohen, of Sherman & Dunn, Washington, D.C., for Building & Construction Trades Dept., AFL-CIO, amicus curiae.
 Before BROWNING, DUNIWAY, and CARTER, Circuit Judges.
 BROWNING, Circuit Judge:
 
 
 1
 The Trades Council and Jens Horstrup, its secretary-treasurer, ask us to set aside an order of the National Labor Relations Board based upon a holding that they had violated section 8(b)(7)(A) of the Act, 29 U.S.C. 158(b)(7)(A), by picketing R. A. Chambers & Associates of Eugene, Oregon. 165 N.L.R.B. No. 86. The Board cross-petitions for enforcement.
 
 
 2
 Chambers is a general contractor in the construction industry. Subcontractors do approximately 60 per cent of Chambers' work; about 40 per cent is done by his own employees. Chambers' employees are carpenters and laborers who are members of locals of the Laborers' Union and the Carpenters' Union.[1] At the time of the picketing, Chambers was a party to collective bargaining contracts with these unions.[2]
 
 
 3
 The Trades Council is an association of local building trade unions, including the Laborers' Union and Carpenters' Union. The Trades Council was not certified as the representative of Chambers' employees-- its membership does not include individual employees. The purpose of the picketing was to require Chambers to execute a formal agreement with the Trades Council, the provisions of which are considered below.
 
 
 4
 The Board concluded that the picketing violated section 8(b)(7)(A) because it had as an object requiring Chambers to recognize or bargain with the Trades Council as the representative of Chambers' employees, at a time when Chambers had lawfully recognized other unions and a question of representation could not appropriately be raised under section 9(c) of the Act, 29 U.S.C. 159(c).
 
 
 5
 Except as we will note, the issues and arguments presented to us were considered by the Court of Appeals for the District of Columbia Circuit in Dallas Building & Construction Trades Council v. NLRB, 130 U.S.App.D.C. 28, 396 F.2d 677 (1968). That court enforced the Board's order. We agree with the Dallas opinion, and enforce a similar order of the Board here.
 
 
 6
 It would serve no useful purpose to deal again with the contentions disposed of in Dallas. With one preliminary observation, we confine our comments to matters not considered in that opinion.
 
 
 7
 It must be conceded that the primary purpose of section 8(b)(7)(A) is to protect employees' freedom of choice in selecting their bargaining agent from the coercive effect of picketing by a 'stranger' union; and that it is not readily apparent that this purpose is served by applying the statute to picketing by an allied or affiliated labor organization rather than one hostile to the lawfully recognized union.[3]
 
 
 8
 However, Congress did not choose to rest the applicability of section 8(b)(7) (A) upon such a distinction. On the contrary, if the other conditions specified in the section are present, picketing is barred when the employer has lawfully rocognized 'any other labor organization.' It cannot be supposed that Congress was unaware of the special problems in the construction industry (see, e.g., section 8(e)); and, as Dallas points out, Congress may well have intended to protect the employer from pressure even from allied or affiliated unions with regard to matters properly subject to settlement by agreement between the employer and the exclusive bargaining agent of his employes. 396 F.2d at 680-681.[4]
 
 
 9
 The exact language of section 8(b)(7)(A) is the product of intense legislative conflict and compromise (NLRB v. Suffolk County District Council of Carpenters, 387 F.2d. 170, 174 (2d Cir. 1967)); and, to an unusual degree, the words of the statute provide the only safe measure of the actual agreement between contending purposes and points of view. Cf. A. Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L.Rev. 257, 266 (1959). Nonetheless, we agree, of course, that it would be proper to read a condition into the statutory language if the legislative history affirmatively supported the Trades Council's thesis that Congress did not intend to bar picketing by an allied or affiliated labor organization in the construction industry. But it does not.[5]
 
 
 10
 The Board's position, in this case and in Dallas, is that 'an object (of picketing) is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees,' if a purpose of the picketing is to establish a continuing contractual relationship with the employer with regard to matters which could substantially affect the working conditions of his employees, and which are the proper subject of bargaining by a lawfully recognized exclusive representative of those employees. See 396 F.2d at 680-81.[6]
 
 
 11
 The Board found that the Trades Council picketed to require Chambers to execute a formal contract to remain in force from year to year unless either party gave notice of termination 60 days prior to an anniversary date. The proposed contract was to replace a similar agreement executed by the parties nine or ten years earlier.[7]
 
 
 12
 The Board further found that several of the provisions of the proposed contract related to subjects already covered by the collective bargaining agreements between Chambers and locals of the Laborers' and the Carpenters' Unions, and would have modified the terms of the latter agreements.
 
 
 13
 Certain of these proposed provisions would have imposed greater restrictions upon the subcontracting of work by Chambers than were imposed by Chambers' existing collective bargaining agreements with the locals. For the reasons stated in Dallas, picketing to secure a continuing agreement with respect to this subject matter intruded upon the area reserved to collective bargaining between Chambers and the craft unions representing Chambers' employees.[8]
 
 
 14
 The Examiner held, and the Board agreed, that several other proposed provisions not involved in Dallas, fell in the same category.
 
 
 15
 The first of these was a provision that the Trades Council would not be bound by the no-strike and arbitration clauses in the agreements with the Laborers' Union and the Carpenters' Union. A second provision would have freed the Carpenters' and Laborers' Unions of the obligation to furnish workmen imposed by hiring-hall provisions of their agreements with Chambers during the time of any violation by Chambers of the proposed agreement with the Trades Council. The Trades Council's argument in support of these two provisions is premised upon the validity of the central provisions restricting subcontracting which these two provisions were designed principally to enforce. The argument falls with its premise.
 
 
 16
 This is equally true of the Trades Council's defense of a final provision to the effect that the craft unions could not modify, amend or alter the proposed agreement without the approval of the Trades Council. The Board interpreted this proposed provision as requiring prior agreement by the Trades Council to the negotiation by Chambers and the craft unions of any change in the terms and conditions of employment of Chambers' employees. The Trades Council argues that this provision applied only to the modification of its proposed agreement. Assuming the latter interpretation to be correct, the provision would require prior Trades Council approval of any changes in the subcontracting articles which were the heart of the proposed agreement. Since, as we have held, restrictions on subcontracting are matters solely for negotiation between Chambers and the lawful representatives of his employees, any provision concerning modification of those restrictions would also be reserved for negotiation between those parties.
 
 
 17
 We enforce the Board's order.
 
 
 18
 JAMES M. CARTER, Circuit Judge (dissenting).
 
 
 19
 I respectfully dissent. The Board's order should not be enforced and the case should be remanded to the Board for further consideration. The decision of the majority erroneously interprets the contract proposed by the Council in order to reach the conclusion that the Council seeks to be the exclusive bargaining representative of the craft unions; and rejects the validity of subcontractor-oriented contracts customarily entered into between Building Trades Councils and general contractors; and emasculates the provisions in Sec. 8(e) and (f), 29 U.S.C. 158(e) and (f), concerning the construction industry.
 
 
 20
 The problems of the Building Trades unions, acting through their Councils, are entirely different problems than those confronting unions operating in industry generally. There the employees generally continue in their employment.
 
 
 21
 In the construction industry on the other hand, the craft worker is usually on the job for a short time and then goes to another job. Hiring halls are usually maintained by the craft unions for a supply of labor. Thus it has been impractical in the past to apply all the rules of the National Labor Relations Act to the building construction industry. The craft union members have suffered in securing their rights under the Act.
 
 
 22
 Congress saw the problem and by amendments in 1959 added the provisos in Sections 8(e) and 8(f)[1] of the Act, 29 U.S.C. 158(e) and (f), to make provision for this situation involving the crafts unions.
 
 
 23
 The situation presently is as follows: The general contractor in the construction industry usually signs a contract for an entire project and then either subcontracts all of the project or at least the so-called subcraft union work to subcontractors. At most, the general contractor usually has only employed laborers for foundation work and other incidental work in the project, carpenters for framing and other forming work, iron workers if steel is used, hoisting and portable engineers to move heavy material and teamsters for transportation. All other work to be done on such projects is then subbed out.
 
 
 24
 In labor management relations, the employers, either individually or through associations, have negotiated traditionally with the four or five basic crafts, to-wit: carpenters, laborers, iron workers, hoisting and portable engineers and teamsters. Building and Construction Trades Councils, which take into affiliation all crafts basically engaged in the construction industry including the aforementioned five (with the present exclusion of the teamsters), include the subcrafts and as such have entered into contracts historically with general contractors and/or their associations establishing contract rights for all subcrafts. This has established an orderly method for handling the problems that arise.
 
 
 25
 These agreements are not intended to require recognition of the Council nor are they intended to encompass bargaining on the wages, hours and working conditions of employees employed by the signatory contractors. The single purpose behind these agreements is to provide an orderly procedure for the contracting and subcontracting of work by these signatory contractors on a basis that is fair to workmen in all of the building and construction trades crafts, as well as to the contractor's competitors. Because a general contractor has complete control over an entire building project, the policy of the building trades unions, through their affiliation with the Council, and the execution by the Council of these agreements with various contractors is to place on the general contractor the obligation of dealing only with subcontractors who have executed current working agreements with appropriate craft unions having jurisdiction of the work performed by their employees. These subcontractor-oriented agreements never were and are not now intended to deal with the general contractor's relations with his own employees. Rather, they are intended only to deal with his contracting and subcontracting of work and thereby his relations with other employers in the building and construction industry. This is the typical situation or procedure of building and construction trades unions throughout the country.
 
 
 26
 Here the Council contends its object in picketing was not to obtain recognition as the exclusive bargaining representative of the employees of the subcontractors involved; but that it sought an agreement with Chambers, the general contractor, placing on him the obligation of dealing only with such subcontractors who would execute current working agreements with the appropriate craft unions having jurisdiction of the work performed by the subcontractor employees.
 
 
 27
 There is nothing illegal in such agreements. The courts have interpreted Sec. 8(e) of the Act, 29 U.S.C. 158(e) as preserving the status quo in the building and construction industry and have expressly recognized the validity and legality of building trades agreements requiring that a contractor subcontract work only to employers who have executed current agreements with the local craft unions having jurisdiction over the work performed by their employees, National Woodwork Mfgrs. Assn. v. NLRB, 386 U.S. 612, 635-642, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); El Paso Bldg. & Construction Trades Council v. El Paso Chapter Associated General Contractors of America, 376 F.2d 797 (5 Cir. 1967).
 
 
 28
 The Examiner, and the Board in adopting his conclusion, strained to interpret the contract proposed by the Council as one making the Council the exclusive bargaining representative of the employees. It obviously was never intended as such; not even as to the general contractor's own employees.
 
 
 29
 No question of fact was involved, only an interpretation of the terms of the proposed contract. We are therefore confronted solely with a question of law as to the meaning of the terms of the contract. All its provisions should be read as one imposing on the general contractor certain obligations in his dealings with subcontractors.[2]
 
 
 30
 Paragraph VII states local agreements shall not bind the Council. It does not in any way affect the local agreements, or the signatories thereto. Paragraph VII would in no way nullify the no-strike or arbitration clauses in a local craft agreement as found by the Examiner. Paragraph IX was interpreted by the Examiner to modify the exclusive hiring hall provisions of the local craft unions. It expressly stated, '* * * it shall not be a violation of this agreement for any employee to refuse to perform any work * * *'. It did not affect the local agreements.
 
 
 31
 The Examiner interpreted Paragraph X (inadvertently referred to as XI) as requiring Chambers, the general contractor, to bargain with the Council before modifications in the wage, hours and working conditions of his employees could be negotiated with the appropriate craft union. It does not so state, but states only that the agreement (proposed) with Chambers, the general contractor, cannot be amended without the consent of the Council. On the contrary, Paragraph II expressly disaffirms any interest or participation by the Council in negotiations for, or terms of, the collective bargaining agreements with the crafts and expressly contemplates that any work by the general contractor's employees will be performed according to the local agreements.
 
 
 32
 Anyone familiar at all with labor agreements can readily see that the Examiner's interpretations adopted by the Board were not only strained but outright erroneous.
 
 
 33
 The majority of this court relying upon Dallas, (396 F.2d 677) states, 'Certain of these proposed provisions would have imposed greater restrictions upon the subcontracting of work by Chambers, than were imposed by Chambers' existing collective bargaining agreements with the locals. For the reasons stated in Dallas, picketing to secure a continuing agreement with respect to this subject matter intruded upon the area reserved to collective bargaining between Chambers and the craft unions representing Chambers' employees. * * * The Trades Council's argument in support of these two provisions is premised upon the validity of the central provisions restricting subcontracting which these two provisions were designed principally to enforce. The argument falls with its premise.'
 
 
 34
 The majority reads Dallas to forbid 'the continuing contractual relationship' inherent in the agreement proposed by the Council. But both Dallas and the majority ignore the cases cited supra, that such contracts are legal.
 
 
 35
 The majority should have held that (1) the proposed contract did not contemplate or make the Council as 'the representative' of the general contractor's employees; (2) that an agreement with the general contractor requiring him to place in his contracts with subcontractors, a provision that work under the subcontracts will be performed by craft union members, was legal. Having so held, the majority should have directed its attention to whether picketing was lawful in attempting to secure the proposed contracts.
 
 
 36
 This would be an open question except for Dallas. The majority assume Dallas to have been correctly decided. But Dallas and the majority opinion suffer from the same infirmity-- the ignoring of the cases cited supra, holding that contracts concerning subcontractors are valid. Consideration should have been given to the Board's decision in IBEW, Local 903 (Pass Development, Inc.) 154 N.L.R.B. 169 (1965) where the Board dismissed a charge of violation of Sec. 8(b)(7)(C), 29 U.S.C. 158(b)(7)(C), involving picketing of a general contractor to force him from doing business with non-union subcontractors. Consideration should also have been given to the case of this circuit, Construction, Production & Maintenance Laborers Union, etc. v. N.L.R.B., 323 F.2d 422 (1963) where in a case involving Sections 8(b)(4)(A) and 8(e), 29 U.S.C. 158(b)(4)(A) and 158(e), we held:
 
 
 37
 'Picketing to secure an agreement to cease doing business with certain persons is not made unlawful by this section where that agreement is within the construction proviso of 8(e).' Id. p. 426.
 
 
 38
 Accord: Essex County and Vicinity District Council of Carpenters, etc. v. N.L.R.B., 332 F.2d 636 (3 Cir. 1964) and Orange Belt District Council of Painters, No. 48 et al. v. N.L.R.B., 117 U.S.App.D.C. 233, 328 F.2d 534 (D.C.Cir. 1964).
 
 
 39
 As to the contracts already existing between Chambers and craft unions, the record shows Chambers was a party to four collective bargaining agreements with local unions. Chambers' employees were members of only the Laborers Union, and the Carpenters Union. He had no employees from the other two unions, the Iron Workers and the Cement Masons. However, his subcontractors would have to employ many workers in other crafts and subcrafts.
 
 
 40
 The fact that Chambers had agreements with four craft unions did not affect the situation. There was nothing in the contract proposed by the Council which forced him to cancel existing agreements. The proposed contract only spoke of the contracts he might thereafter enter with subcontractors. Obviously, where he had contracts with craft unions, Paragraph II of the proposed agreement controlled and provided the existing contracts covered the employees of Chambers who were members of the four craft unions. The proposed contract simply said in summary 'subcontractors will use craft union members.'
 
 
 41
 Finally, as to Chambers' contracts with the four craft unions there is the possible contention that the effort of the Council to secure a clause valid under Sec. 8(e), 29 U.S.C. 158(e), was in part a violation of Sec. 8(b)(3), 29 U.S.C. 158(b)(3), insofar as it affected those locals which had bargained for such a clause in their separate negotiations with Chamber's bargaining representative. This question is not presented by this case, since no charge of violation of Sec. 8(b)(3), 29 U.S.C. 158(b)(3) was made. In any event, proof of violation of Sec. 8(b)(3), 29 U.S.C. 158(b)(3), (which was not charged) obviously does not constitute proof of violation of Sec. 8(b)(7), 29 U.S.C. 158(b)(7), which is the sole issue in this case.
 
 
 42
 The case should be remanded to the Board for reconsideration.
 
 
 
 [1]
 The Trades Council challenges the Board's finding that Chambers' employees were union members at the time collective bargaining contracts were executed with the locals. Chambers testified under oath that they were; and the weight of his testimony was for the Board to determine. There was no evidence to the contrary
 
 
 [2]
 Chambers also became a party to collective bargaining agreements with two other local unions affiliated with the Trades Council, the Iron Workers and the Cement Masons, but it appears that Chambers did not employ men in either craft
 
 
 [3]
 It should be noted, however, as the trial examiner observed, that 'There is no indication in this record of the position of the four crafts concerning this tactic by Respondents.' 165 N.L.R.B. No. 86, at note 5
 
 
 [4]
 It is at least clear from the legislative history that 8(b)(7)(A) was intended to protect both parties to a lawful bargaining relationship-- the employer as well as his employees. I Leg.His. of the LMRDA of 1959 781-782; 2 Leg.His. of the LMRDA 994, 1185, 1191, 1291, 1518, 1576, 1582, 1828, 1858
 
 
 [5]
 The Building and Construction Trades Department, AFL-CIO, amicus curiae, points out that 8(b)(7) bars picketing to require an employer to recognize or bargain with a labor organization 'as the representative' of his employees, and argues that the section therefore applies only where the picketing union seeks recognition as the exclusive representative of the employees. This contention was rejected in Dallas on the ground that it 'does not appear to be compatible with the clear purpose of Section 8(b)(7) to prevent any infringement of the recognized union's representative status.' 396 F.2d at 680 n. 5. If the construction suggested by amicus were adopted, 8(b)(7) would have little or no substance since any union, competing or allied, could avoid the statute merely by limiting its demands upon the employer to anything less than the full range of bargainable subjects
 
 
 [6]
 This position was foreshadowed by the Board's pre-Landrum-Griffin Act interpretation of 8(b)(4)(C). See Industrial Chrome Plating Co., 121 N.L.R.B. 1298, 1300 (1958); Lewis Food Co., 115 N.L.R.B. 890, 892-93 (1956)
 
 
 [7]
 The Trades Council contends that Chambers was still bound by this earlier agreement with it when he executed collective bargaining agreements with the local craft unions, and thus the local craft unions were not 'lawfully recognized' by Chambers as required by 8(b)(7)(A). Since the local craft union contracts were executed over a year before the picketing occurred, the Trades Council is barred by 10(b) of the Act from asserting that those unions were not 'lawfully recognized.' Rowan Stone Construction, 153 N.L.R.B. 659 n. 3. Nor could the Council have brought a petition for an election. NLRB v. Local 3, I.B.E.W., 362 F.2d 232, 236 (2d Cir. 1966)
 The Trades Council's contention that the craft collective bargaining agreements were pre-hire agreements within the meaning of 8(f) and therefore not a bar to a petition under 9(c), is sufficiently answered in Dallas, 396 F.2d at 679 n. 4, on undistinguishable facts.
 
 
 [8]
 We agree with the holding in Dallas that this construction of 8(b)(7)(A) is consistent with the letter and spirit of the first proviso in 8(e). 396 F.2d at 682
 
 
 [1]
 '(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: Provided further, * * * Provided further, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception
 (f) It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: Provided, That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section: Provided further, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.'
 
 
 [2]
 It is true that each of Chambers' contracts with the four crafts require his new subcontractors to adhere to the wages, hours and working conditions set forth in his existing contract with the particular craft. The contracts he has entered into are conflicting, in that the question would arise,-- which set of hours, wages and working conditions in which contract should be observed by a new subcontractor?
 The conflict is not between the general agreement proposed by the Building Trades Council and the existing craft agreements. The conflict is between these existing craft contracts themselves, executed by Chambers, which deal with hours, wages and conditions of employment, each stating the subcontractor shall adhere to its particular wage, hour, etc. formula.
 This is not something brought about by the Building Trades Council and not brought about by the agreement which it proposes. If a conflict arises here, it will have to be worked out between Chambers and the Unions with which he has contracts. This possibility exists independent of an agreement with the Building Trades Council. Chambers' act in signing the proposed agreement with the Building Trades Council would not add to the conflict.