**GIGLIOTTI CORPORATION**

v.

**BUILDING AND CONSTRUCTION TRADES COUNCIL OF PHILADELPHIA AND VICINITY.**

Civ. A. No. 83–4640.

United States District Court, E.D. Pennsylvania.

March 29, 1984.

Roger D. Susanin, Bray, McAleese, McGoldrick & Susanin, Bala Cynwyd, Pa., for plaintiff.

Richard B. Sigmond, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

Plaintiff is a general contractor. Defendant is a labor organization whose members comprise various trade unions in the Philadelphia area and its surroundings. Defendant has filed a demand for arbitration with the American Arbitration Association, based on a 1969 contract between defendant and Chris Gigliotti and Son, Inc., plaintiff's predecessor corporation. Plaintiff seeks a declaration that the contract is unenforceable as against plaintiff and a permanent injunction barring the arbitration.

The parties have stipulated to the following facts: On March 19, 1969 Chris Gigliotti and Son, Inc. entered into a contract with the defendant. Among other provisions, that contract guaranteed that Chris Gigliotti and Son, Inc. would bargain only with a member union of the defendant council. It further guaranteed that Chris Gigliotti and Son, Inc. would require its subcontractors to enter into collective bargaining agreements only with member unions of the defendant. Furthermore, the contract stated that the agreement "shall remain in full force and effect until the day of March 19, 1970, and shall continue from year to year thereafter unless either party gives written notice to the other, ninety days prior to any annual termination date, of the desire to change any of the terms of this agreement." (Exhibit B to the stipulation). On April 19, 1974, Thomas Magrann, the business manager of the defendant, sent a letter to Chris Gigliotti and Son, Inc., along with a revised building trades agreement.

The letter stated that the 1969 agreement was "for all intents and purposes ... outmoded". (Exhibit C to the stipulation). That letter was received on or about April 24, 1974.

On April 30, 1974, Chris Gigliotti and Son, Inc. merged into Verree-Welsh Homes, Inc. (Exhibit A to the stipulation). On the same day, the enterprise resulting from the merger was renamed Gigliotti Corporation. The ownership interests in Chris Gigliotti and Son, Inc., Verree-Welsh Homes, Inc. and Gigliotti Corporation during the relevant time periods were as follows: (1) On March 19, 1969, eighty-five percent of the outstanding shares of Verree-Welsh Homes, Inc. was owned by Chris Gigliotti. Fifteen percent of the outstanding shares of Verree-Welsh Homes, Inc. was owned by Frank J. Montamuro; (2) On March 19, 1969, eighty-five percent of the outstanding shares of Chris Gigliotti and Son, Inc. was owned by Chris Gigliotti. Fifteen percent of the outstanding shares was owned by Frank J. Montamuro; and (3) On May 1, 1974, ninety-five percent of the outstanding shares of Gigliotti Corporation was owned by Chris Gigliotti. Five percent of the outstanding shares of Gigliotti Corporation was owned by Frank J. Montamuro.

From March 19, 1969 until the date of merger, April 30, 1974, Chris Gigliotti and Son, Inc. employed carpenters and laborers who were represented by member unions of the Building and Construction Trades Council. It did not employ any other individuals skilled in trades represented by member unions of the BCTC. From March 19, 1969 until the date of the merger, April 30, 1974, Verree-Welsh Homes, Inc. engaged solely in the purchase, development, and sale of real estate and at no time did it employ any construction workers.

Neither Chris Gigliotti and Son, Inc. nor Gigliotti Corporation ever communicated any notice of termination to the BCTC in reference to the 1969 agreement. Furthermore, neither Chris Gigliotti and Son, Inc. nor Gigliotti Corporation ever responded to

the 1974 letter from Thomas Magrann mentioned above.

On May 1, 1975, the Home Builders Association, on behalf of Gigliotti Corporation, entered into a collective bargaining agreement with the Laborers District Council of the Metropolitan Area of Philadelphia and Vicinity. On May 1, 1978, the Home Builders Association, on behalf of Gigliotti Corporation, entered into a collective bargaining agreement with the Metropolitan District Council of the United Brotherhood of Carpenters and Joiners of America. (Exhibit E to the stipulation).

The collective bargaining agreements between Gigliotti Corporation and the United Brotherhood of Carpenters and Joiners and the Laborers' District Council terminated in 1983. Since the termination of those agreements, Gigliotti Corporation has not entered into any collective bargaining agreements with any of the affiliated local unions of the BCTC. Furthermore, since the termination in 1983 of those agreements, Gigliotti Corporation has subcontracted work on occasion to subcontractors who are not signatory to collective bargaining agreements with affiliated local unions of the BCTC. On August 1, 1983, the BCTC made a demand for arbitration based on its 1969 agreement with Chris Gigliotti and Sons, Inc., contending that plaintiff should hire only members of unions affiliated with BCTC.

■ Under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), I have jurisdiction over this suit. Because the contract calls for arbitration, however, my role as a federal district judge is very limited. *United Steelworkers v. American Manufacturing Company*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). Under *United Steelworkers*, I must determine whether the dispute in question is arbitrable. Normally, my determination would be limited to "whether the party seeking arbitration is making a claim which on its face is governed by the contract." *Id.* at 568, 80 S.Ct. at 1346.

In this case, however, there is an additional question: whether the contract is enforceable against Gigliotti Corporation. If Gigliotti is not bound by the contract, then it cannot be compelled to arbitrate a dispute pursuant to the arbitration clause of the contract. *John Wiley and Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

## I. Arbitrability of the dispute

■ The arbitration clause in the agreement states that "all disputes, grievances or complaints involving the interpretation or application of this Agreement" shall be arbitrated. Assuming that Gigliotti Corporation is a party to the contract, this broad clause clearly covers the dispute in question, i.e., whether or not the plaintiff is bound to hire carpenters and laborers who are members of the unions affiliated with the BCTC.

## II. Enforceability of the contract against plaintiff

Plaintiff asserts, however, five reasons why the 1969 contract with BCTC is unenforceable against Gigliotti Corporation. First, Gigliotti Corporation claims that it is not bound by the contract because plaintiff is not a signatory to the contract. Second, plaintiff argues that before the merger, BCTC, through the 1974 Magrann letter, terminated the contract with Chris Gigliotti and Son, Inc. pursuant to the termination clause. Thirdly, plaintiff asserts that the Magrann letter repudiated the contract as a matter of law. Fourth, plaintiff argues that the contract automatically terminated as a matter of law when Gigliotti Corporation executed collective bargaining agreements in 1975 and 1978 with its employees. And, finally, plaintiff asserts that the contract violates §§ 1 and 2 of the Sherman Act and is therefore unenforceable as contrary to public policy.

Because I find that plaintiff is bound by the contract as a successor to Chris Gigliotti and Son, Inc. and because the contract has not been terminated or repudiated as a matter of law, I refuse to grant plaintiff's requested declaratory and injunctive relief.

■ The fact that plaintiff is not signatory to the contract with BCTC is not necessarily conclusive. In *John Wiley, supra,* the Court held that a successor corporation was required to arbitrate under a contract entered into by its predecessor with the union. In *Howard Johnson Co. v. Hotel Employees,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), the Court held that a corporation that merely purchased the assets of its predecessor was not bound by the collective bargaining agreement of its predecessor with the union. The answer to the question of successor liability for a contract with the union depends on the particular facts in each case. *Id.* at 262 n. 9, 94 S.Ct. at 2243 n. 9. The *Howard Johnson* Court distinguished *Wiley* because *Wiley* involved a merger "as a result of which the initial employing entity completely disappeared", *id.* at 257, 94 S.Ct. at 2240, whereas Howard Johnson's merely bought some of the assets from the initial employers and the original companies continued to exist as viable corporate entities. *Id.*

The Court in *Howard Johnson* set forth reasons for distinguishing between a merger and a purchase of assets. First, the merger in *Wiley* "was conducted 'against a background of state law that embodied the general rule that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation'", *Howard Johnson Co., supra,* at 257, 94 S.Ct. at 2241, *quoting NLRB v. Burns International Security Services,* 406 U.S. 272, 286, 92 S.Ct. 1571, 1581, 32 L.Ed.2d 61 (1972).

Furthermore, in a merger situation, the original contracting party disappears and there may be no means to enforce the obligation voluntarily undertaken by the disappearing corporation. In *Howard Johnson* the union had a realistic remedy against the corporations that sold some of their assets to Howard Johnson.

■ The present case falls squarely within the *Wiley* reasoning. First, there was a merger as a result of which Chris Gigliotti and Son, Inc. disappeared. Second, Pennsylvania state law in existence at the time of the merger held the surviving corporation of a merger responsible for all the liabilities and obligations of each of the corporations so merged or consolidated, 15 Pa.Stat.Ann. § 1907, *Dawejko v. Jorgensen Steel Company,* 290 Pa.Super. 15, 434 A.2d 106 (1981). Third, the merger agreement itself makes Gigliotti Corporation responsible for the contract obligations of its predecessor. That contract states:

> The continuing corporation shall ... be responsible for all debts, liabilities, obligations and duties of each constituent corporation, and all said rights, liens, debts, liabilities, obligations and duties shall henceforth attach to the continuing corporation and may be enforced against it to the same extent as if they had been incurred or contracted by it ...

There can be no doubt, therefore, that in this case a requirement to arbitrate disputes with the BCTC was "fairly within the reasonable expectations of the parties." 417 U.S. at 257, 94 S.Ct. at 2241. There is no merit to plaintiff's argument that the merger provides an escape from the duties to arbitrate under the contract with the BCTC.

■ Plaintiff's second argument that the 1974 Magrann letter terminated the contract can also be dismissed. A determination of whether the letter terminated the contract or not depends on an interpretation of the termination clause of the contract. Because the arbitration clause of the contract calls for arbitration of all disputes involving the interpretation of the agreement, this question is clearly one for the arbitrator.

Gigliotti Corporation contends next that the agreement between BCTC and Chris Gigliotti and Son, Inc. is a pre-hire agreement authorized by § 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f). In *Jim McNeff v. Todd,* —— U.S. ——, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983), the Court held that a § 8(f) pre-hire agreement can be repudiated by a party before the union gains majority status. According to plain-

tiff, the Magrann letter was a repudiation of the agreement by the union.

This argument also fails. First, defendant contests plaintiff's characterization of the agreement between Chris Gigliotti and Son, Inc. and BCTC as merely a pre-hire agreement under § 8(f). In *Altemose Construction Co. v. BCTC*, No. 73–773, slip op. (E.D.Pa. July 5, 1983), Judge Shapiro found that this very agreement was "at least a pre-hire agreement." In that case, it was necessary for the judge to find a pre-hire agreement in order to establish a collective bargaining relationship between the parties. Judge Shapiro did not consider whether the agreement was more than a § 8(f) pre-hire agreement. I agree with defendant's contention that Judge Shapiro's finding that the agreement was "at least a pre-hire" agreement is not determinative of the question whether the agreement was more than an agreement under § 8(f). Furthermore, even assuming that this is a § 8(f) agreement, there is no evidence in the record as to when or whether the union reached majority status.

■ Resolving, as I must, all doubts in favor of arbitration, the questions of whether this is an § 8(f) agreement, and, if so, whether the agreement was repudiated by the Magrann letter are ones of interpretation of the contract and must be decided by the arbitrator.

Plaintiff's next argument is that the contract between it and BCTC automatically terminated as a matter of law when plaintiff contracted with the laborers and carpenters in 1975 and 1978 respectively, thereby establishing terms and conditions of employment for every construction trade member that it would employ. Plaintiff reasons that because all carpenters and laborers who were covered by the BCTC agreement had contracts with the plaintiff by 1978, the policy of exclusive representation embodied in § 9(a) of the National Labor Relations Act would require the automatic termination of the BCTC agreement.

Section 9(a) requires that representatives selected as bargaining agents "shall be ex-clusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment ..."

The purpose of § 9(a) is to stabilize industrial relations and promote harmony in the work place by prohibiting employers from dealing with minority unions or individuals in order to weaken union support or usurp the function of the union to speak for its members. R. Gorman, *Labor Law* 379 (1976).

■ All carpenters and laborers covered by the BCTC agreement had union contracts with Gigliotti Corporation from 1978 to 1983. The question is whether the BCTC umbrella agreement terminated as a matter of law in 1978. In *BCTC v. NLRB*, 415 F.2d 656 (9th Cir.1969) and *Dallas Building and Construction Trades Council v. NLRB*, 396 F.2d 677 (D.C.Cir.1968) the courts held that picketing in order to obtain an umbrella agreement where bargaining units were already in place was an unfair labor practice under § 8(b)(7)(A), 29 U.S.C. § 158(b)(7)(A). Plaintiff argues that these cases support its contention that umbrella agreements must be illegal as a matter of law if the employees are represented by other bargaining agreements. Plaintiff has not cited, nor have I found, any cases that are directly on point. In *Dallas, supra*, the court conceded that broad umbrella contracts are legal in the construction industry. Both *BCTC* and *Dallas* condemned picketing as an illegal method to attain such an agreement, not the agreements themselves. Moreover, even assuming that § 9(a) would bar the BCTC from enforcing its umbrella agreements as a matter of law during the pendency of collective bargaining agreements between individual unions representing the laborers and carpenters and Gigliotti Corporation, those collective bargaining agreements expired in 1983 and there can be no conflict between the individual unions and the BCTC now. For these reasons, I cannot find that the BCTC agreement terminated as a matter of law in 1978. Whether as a

matter of fact the contract called for its own dissolution upon representation of the laborers and carpenters by individual unions is a question of contract interpretation for the arbitrator.

Plaintiff's final contention is that the contract violates §§ 1 and 2 of the Sherman Act and is therefore unenforceable as contrary to public policy.[1]

Plaintiff relies on the decision in *Connell Construction Co. v. Plumbers and Steamfitters Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), in which the Court found that an agreement between a labor union and a construction company was subject to the antitrust laws.

I must first determine whether under the labor laws there is protection for the type of agreement in question here. Then, I must determine whether there is an exemption based on the labor laws from antitrust liability for this type of agreement.

Section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), prohibits "hot cargo" clauses, that is, agreements between the employer and union forbidding the employer to refrain from using certain products or from doing business with other persons. There is, however, a proviso to § 8(e) that protects the construction industry.[2] The first question in *Connell* and in this case is whether the agreement in question falls within the protection of the construction proviso. In *Connell*, where the union expressly denied an interest in representing Connell's employees, the court held that the agreement between the employer and the union did not occur in the context of a collective bargaining relationship between the employer and union and, therefore, the construction industry proviso to § 8(e) did not protect the agreement. In

*Connell,* the union, a stranger to the general contract, successfully picketed the employer in order to force the employer to sign an agreement not to work with non-union subcontractors in any of the employer's places of business. *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982) clarified the *Connell* decision. In *Woelke,* the Court held that the construction industry proviso to § 8(e) of the NLRA "ordinarily shelters union signatory subcontracting clauses that are sought or negotiated in the context of a collective bargaining relationship even when not limited in application to particular job sites at which both union and non-union workers are employed." 456 U.S. at 666, 102 S.Ct. at 2083.

In *Altemose, supra,* Judge Shapiro found that the agreement in question here is "at least" a pre-hire agreement under § 8(f). This finding was sufficient under *Donald Schriver, Inc. v. NLRB,* 635 F.2d 859 (D.C.Cir.1980), *cert. denied,* 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981), to find a collective bargaining relationship and, consequently, protection for the agreement under the construction industry proviso to § 8(e). I agree with Judge Shapiro's characterization that the purpose of a pre-hire agreement is to initiate a collective bargaining agreement that will establish enforceable terms concerning conditions of employment. Therefore, whether this is a pre-hire agreement or more than a pre-hire agreement, it took place during a collective bargaining relationship and is protected by the proviso to § 8(e) ...

Having concluded that the labor laws protect the agreement in question, the only remaining question is whether the agreement is exempt from the antitrust laws.

---

1. Section 1 of the Sherman Act, 15 U.S.C. § 1 provides that any contract or combination in restraint of trade or commerce is illegal. Section 2 of the Sherman Act, 15 U.S.C. § 2 provides that it shall be illegal to monopolize or attempt to monopolize any part of the trade or commerce among United States.

2. § 8(e) states: "It shall be an unfair labor practice for any organization and any employer to enter into any contract ... whereby such em-

ployer ... agrees ... to cease doing business with any other person ... *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building or structure, or other work ...".

In *Connell,* the Court acknowledged that there were two types of labor exemptions from the antitrust laws. In this case, defendant argues that it is exempt by means of the nonstatutory exemption which "has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions." 421 U.S. at 622, 95 S.Ct. at 1835.

Although a finding that a particular agreement is protected by the labor laws may not conclusively exempt the agreement from liability under the antitrust laws, *Consolidated Express v. New York Shipping Association,* 602 F.2d 494 (3d Cir.1979), *cert. granted, vacated and remanded,* 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980), such a finding argues strongly for antitrust exemption. *See Altemose, supra* at 44. In this case, I am acting with an almost barren record of few stipulated facts. Judge Shapiro found a nonstatutory exemption for this very agreement upon a full record. Plaintiff has not met its burden of proving that the agreement is unenforceable as violative of the Sherman Act. I will therefore adopt Judge Shapiro's finding and deny plaintiff's injunctive and declaratory relief and order that the parties arbitrate the dispute.