**CONNELL CONSTRUCTION COMPANY, INC., Plaintiff-Appellant,**

v.

**PLUMBERS AND STEAMFITTERS LOCAL UNION NO. 100, etc., Defendant-Appellee.**

No. 72–1243.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1973.

Rehearing and Rehearing En Banc Denied Nov. 19, 1973.

Joseph F. Canterbury, Jr., Smith, Smith, Dunlap & Canterbury, Dallas, Tex., for plaintiff-appellant.

William L. Keller, Allen Butler, Dallas, Tex., amicus curiae.

David Richards, Austin, Tex., for defendant-appellee.

Louis Sherman, Washington, D. C., amicus curiae.

Before MORGAN, CLARK and IN-GRAHAM, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This action is brought by Connell, a general contractor, against Plumbers Local 100, alleging that a contract with that union which Connell entered under pressure from the union violates the antitrust laws. After trial, the District Court for the Northern District of Texas held for the defendant union, finding that Congress had, in amendments to the National Labor Relations Act, expressly recognized the validity of contracts such as the one in issue as a legitimate union tool in the construction industry. Connell appeals from that judgment.

I

Connell is a general contractor engaged in the construction industry in Texas. Connell was first contacted by the union and asked to enter a contract with the union whereby Connell agreed not to do any business with any plumbing and mechanical firm unless such firm was a party "to an executed, current collective bargaining agreement" with the union.[1] This initial missive

---

1. The text of the proposed agreement was as follows:

WHEREAS, the contractor and the union desire to make an agreement applying in the event of subcontracting in accordance with Section 8(e) of the Labor-Management Relations Act;

WHEREAS, it is understood that by this agreement the contractor does not grant, nor does the union seek, recognition as the collective bargaining representative of any employees of the signatory contractor; and

WHEREAS, it is further understood that the subcontracting limitation provided herein applies only to mechanical work which the contractor does not perform with his own employees but uniformly subcontracts to other firms;

THEREFORE, the contractor and the union mutually agree with respect to work falling within the scope of this agreement that is to be done at the site of the construction, alteration, painting or repair of any building, structure, or other works, that if the con-

from the union indicated that if Connell did not sign with 10 days, the union would undertake to place pickets at various construction sites where Connell was the general contractor. When Connell failed to sign this proposed contract, the union placed a single picket at The Bruton Venture Project in Dallas, Texas, on which Connell was the general contractor.

Upon the commencement of this picketing about 150 employees (both of Connell and its various subcontractors) left the site of this project, effectively halting construction. In January of 1971, Connell instituted this action in a Texas state court alleging a violation of the Texas antitrust laws. The Texas court granted a temporary injunction against the picketing. The union then removed the case to federal court and, after the district court refused to remand the case back to state court; Connell entered, under protest, an agreement not to do any business with subcontractors who did not have a current collective bargaining agreement with the union. It is this agreement, substantially what the union sought through its picketing, that Connell alleges to be an antitrust violation.

Connell did not have any employees of its own who were members of the appellee union at the time of the demand to contract and the picketing. In fact, Connell has never at any time material to this case had any of its own employees who belonged to this union. The subcontractor who was being used by Connell at The Bruton Venture Project did, in fact, at that time have a current collective bargaining contract with the union.

It is undisputed that Connell itself is in the practice of virtually always contracting out the mechanical work on its construction jobs. It appears that this subcontracting is generally done on the basis of bids from various mechanical subcontractors. Connell has in the past given these jobs to both unionized and nonunionized subcontractors on approximately an equal basis.

II

It becomes readily apparent that while this case is framed in the terms of antitrust, its origins and implications are most intimately connected with and extremely important to the delicate balance of labor-management power in the construction industry and national labor policy pertaining thereto. This is in a sense a labor problem and must be analyzed in light of national labor policy as set forth by Congress. The antitrust aspects of the case are bottomed on the claim that the union is undertaking to restrict competition by forcing this general contractor through contract with the union to give all its work to unionized subcontractors. It is such a contract which Connell claims restricts trade and violates the antitrust laws.

III

The instant proceeding is not the first round in the battle over the issues involved in this case. Some knowledge of the background of this action would appear helpful in putting it into proper perspective.

The instant action has more far reaching effects than merely this proceeding. It is another phase of the struggle between the trade unions in the construction industry and general contractors in Dallas. We know of at least two earlier legal proceedings.

In Dallas Building Trades v. NLRB, 1968, 130 U.S.App.D.C. 28, 396 F.2d 677, a similar subcontractor agreement was before the District of Columbia Circuit on petition for enforcement of an NLRB order. Members of the Dallas Building

tractor should contract or subcontract any of the aforesaid work falling within the normal trade jurisdiction of the union, said contractor shall contract or subcontract such work only to firms that are parties to an executed, current, collective bargaining agreement with Local Union 100 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry.

Trades Council had picketed a general contractor to obtain a subcontractor agreement like the one in this case. That general contractor, unlike Connell, had employees who were not union members doing work at the picketed jobsite and who would be covered by the agreement with the union. The only violation found by the Board and upheld by the District of Columbia Circuit was based on the fact that this general contractor had unorganized employees. It was held that while picketing for the contract was legal, there was also sufficient evidence to support a finding that the picketing was recognitional in nature, in addition to seeking the subcontractor agreement, and that such picketing, where *an object* was recognition, was limited by section 8(b)(7) of the NLRA to 30 days, which time had been exceeded by the union in this case. The council and its constituent members then turned to picketing contractors who had no employees of their own who could be covered by the agreement to avoid the recognitional problem.

The general contractors then apparently sought to challenge this picketing of generals without any employees of their own who could be covered. As set forth by the district court in this case, there has been an attempt to take the very issue involved in this action to the NLRB in the form of a labor dispute.

This same union sent a contract similar to the one in this case to K.A.S. Construction Company in Richardson, Texas, and, following that general contractor's refusal to sign the proposed agreement, commenced picketing. K.A.S. sought to bring an unfair labor practice proceeding. The regional office of the NLRB in Fort Worth refused to issue a complaint against the union and an appeal of this refusal was denied by the General Counsel of the NLRB in Washington. Although it has apparently never been expressly adjudicated, it is generally accepted that a decision by the General Counsel not to file a complaint is unreviewable. See Cox and Bok, Cases on Labor Law 138 (7th Edition 1969). Therefore, as long as the regional director and the General Counsel refuse to issue a complaint, a general contractor such as Connell has no way through the processes set up by the NLRA to challenge before the Board or in court the picketing and other economic sanctions used by a union in seeking an agreement such as the one herein.

Having thus failed to obtain an adjudication of this agreement from the NLRB in the context of a labor law issue, the general contractors sought a new line of attack. When Connell was faced with the same demand as K.A.S. earlier, it made no attempt to invoke NLRB procedures but took a different course—antitrust attack.

### IV

The first question which we face in this case is whether or not this action can be maintained under federal antitrust statutes. After careful consideration, we find that it cannot be. Labor unions enjoy no blanket exemptions from the antitrust laws. See United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941). They do, however, have a somewhat special status in the realm of antitrust. The test, as it has come down in various Supreme Court opinions, seems to turn on the union's combination with non-labor groups to create a monopoly among various conspiratory interests. In other words, the purposes sought by the conspiracy must have goals which go beyond legitimate union aims and result in an anticompetitive situation.

As a basic proposition, it is usually stated that: "The antitrust laws are not concerned with competition among laborers or with bargains over the price or supply of labor—its compensation or hours of service or the selection and tenure of employees." Cox, Labor and the Antitrust Laws, 14 Pa.L. Rev. 252, 255 (1955).

Originally, in the area of antitrust and labor, the Supreme Court broadly applied antitrust law to union activities. However, the clear trend in recent years has been to grant labor a broad exemption from antitrust sanctions, applying the latter only in narrowly limited situations. Examples of the early Supreme Court position include Loewe v. Lawlor (Danbury Hatters), 208 U.S. 274, 28 S. Ct. 301, 52 L.Ed. 488 (1908), wherein an employer was allowed to sue under the Sherman Act when a union exerted pressure on him to unionize by a nation-wide boycott. Next Congress enacted sections 6 and 20 of the Clayton Act [2] which, at the time, were generally believed to give unions broad exemptions from antitrust laws. In Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), the Supreme Court held that section 6 of the Clayton Act only protected the existence and lawful activities of union organizations and that section 20 prevented the application of the antitrust laws only to a labor dispute between employees and their immediate employer. The activity in that case was not within either of these definitions so it was held violative of the antitrust provisions. In some instances *Duplex* has some similarities to this case because here we do not have the immediate employer and there is a question as to whether these are "lawful" activities under the National Labor Relations Act. Also, *Duplex* involved a secondary boycott.

Then, in 1932, the Norris-LaGuardia Act was enacted. Norris-LaGuardia removed the power of courts to issue injunctions in a case involving or growing out of a labor dispute except in cases explicitly outlined in the Act. Section 13(c) [3] stated that the limitation was

2. Sec. 6. That the labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

\* \* \* \* \*

Sec. 20. That no restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means to do so; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States.

3. (c) The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or con-

**1160**

applicable whether or not the dispute was between employees and their particular employer, thus, striking directly at the *Duplex* decision.

The Supreme Court continued to apply the Sherman Act, however, in cases where the union combined with an employer. See Teamsters Local 167 v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804 (1934). That case involved conspiracy between Local 167 and the Slaughterers to fix prices and divide territories. The Supreme Court upheld an injunction on the ground that the combination there to monopolize commercial activities had little immediate connection with the needs of the union.

Soon thereafter the tide began to change and antitrust laws were applied far less stringently to labor unions. The first important case in this regard was Apex Hosiery v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311. The union had struck the employer in quest of its desire for a union closed-shop clause. The strikers seized the plant and locked the employer out. The Court held that this was not within the Sherman Act and intimates that no matter how reprehensible the conduct, that alone cannot make it an antitrust violation. The court pointed out that Congress had repeatedly passed laws trying to take unions out of the scope of the antitrust laws. Furthermore, this was not a case where a labor organization was being used by a combination of those engaged in an industry as the means or instrument for suppressing competition or fixing prices. 310 U.S. at 501, 60 S.Ct. 982. The Court said that here, while the union's actions would result in the removal of the manufacturer's products from interstate commerce, this was not attempted as a device to restrict competition, but rather was designed to achieve legitimate union aims:

> Strikes or agreements not to work, entered into by laborers to compel em-

ployers to yield to their demands, may restrict to some extent the power of employers who are parties to the dispute to compete in the market with those not subject to such demands. But under the doctrine applied to non-labor cases, the mere fact of such restrictions on competition does not in itself bring the parties to the agreement within the condemnation of the Sherman Act. Appalachian Coals, Inc., v. United States, supra, 288 U.S. [344] 360, 53 S.Ct. [471] 474, 77 L. Ed. 825 [829], supra. *Furthermore, successful union activity, as for example consummation of a wage agreement with employers, may have some influence on price competition by eliminating that part of such competition which is based on differences in labor standards.* Since, in order to render a labor combination effective it must eliminate the competition from non-union made goods, see American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 209, 42 S.Ct. 72, 78, 66 L.Ed. 189, 199, 27 A.L.R. 360, *an elimination of price competition based on differences in labor standards is the objective of any national labor organization.* But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act. See Levering & G. Co. v. Morrin [289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062], supra; cf. American Steel Foundries Case, supra, 257 U.S. 209, 42 S.Ct. 78, 66 L.Ed. 189, 27 A. L.R. 360, supra; National Ass'n of Window Glass Manufacturers v. United States, 263 U.S. 403, 44 S.Ct. 148, 68 L.Ed. 358. 310 U.S. at 503–504, 60 S.Ct. at 997–998 (Emphasis supplied).

So, while basically this case established that combinations between employers were not restraints, the language set out above also relates to the general anti-competitive result of every union contract with an employer.

---

ditions of employment, regardless of whether or not the disputants stand in

the proximate relation of employer and employee.

The next year the Supreme Court decided a landmark case on labor's combination with non-union groups and the applicability of the antitrust laws thereto. In United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), Justice Frankfurter addressed the question of the use of conventional peaceful activities by a union against an employer in a dispute with a rival union as an antitrust violation. In the underlying dispute, the union was having difficulty with the employer over assignment of certain contested work. To achieve its ends, the union engaged in primary and secondary activities. The strike activities were directed against the employer's product as well as the employer and the contractors who were doing the disputed work.

In a well-reasoned opinion, Mr. Justice Frankfurter reviewed the history of labor unions and the antitrust laws in both the courts and Congress. In an oft-quoted passage he states:

*So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under section 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.* There is nothing remotely within the terms of section 20 that differentiates between trade union conduct directed against an employer because of a controversy arising in the relation between employer and employees, as such, and conduct similarly directed but ultimately due to a internecine struggle between two unions seeking the favor of the same employer. (Emphasis supplied). 312 U.S. at 232, 61 S.Ct. at 466.

The Court went on to find the conduct involved was expressly protected by section 20 of the Clayton Act. Finally, the Court stated that Norris-LaGuardia was intended by Congress to reestablish the broad labor union exemption which it thought it had written in section 20 of the Clayton Act but which had been frustrated by the courts in cases such as *Duplex*. Id. 254 U.S. at 236, 41 S.Ct. 172.

As might be expected, cases subsequent to *Hutcheson* have explored and refined the exception therein that whenever a union conspired with a non-labor group in restraint of trade, the broad exemption of labor unions from the antitrust laws was not applicable. In Allen Bradley v. I. B. E. W. Local 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), the Supreme Court applied the *Hutcheson* exception to find a union guilty of antitrust violation. The evidence established that the electrical union became partners with electrical manufacturers and independent contractors in the City of New York to create a monopoly for all three. It obtained various closed shop agreements from contractors and manufacturers which by cross-obligations required the contractors to buy equipment only from manufacturers having a current bargaining agreement with the local and, in turn, obligated those manufacturers with regard to sales in the Metropolitan New York area to sell only to independent contractors having current agreements with the local. Over time, these individual agreements expanded into an area-wide, industry-wide undertaking with the contractors, manufacturers and union jointly participating to fix prices and control recalcitrant members. The resulting monopoly brought great success to the contractors, manufacturers and the union.

Noting that the agreement here would clearly be an antitrust violation without the presence of the union, Mr. Justice Black went on to frame the question before the Court quite precisely:

Our problem in this case is therefore a very narrow one—do labor unions violate the Sherman Act when, in order to further their own interest as wage earners, they aid and abet businessmen to do the precise things which that Act prohibits?

Following a review of the legislative and judicial history of labor unions and anti-trust, the Court directly addressed the problem of reconciling two declared congressional policies—preservation of a competitive business economy and the rights of labor to organize to better its condition.

The ultimate resolution of these competing policies was stated quite clearly:

> . . . we think Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services. 325 U.S. at 808, 65 S. Ct. at 1539.

In further commentary the Court made expressly clear that the antitrust exemption was lost only because of the obvious violation by the business interest:

> The primary objection of all the Anti-trust legislation has been to preserve business competition and to proscribe business monopoly. It would be a surprising thing if Congress, in order to prevent a misapplication of that legislation to labor unions, had bestowed upon such unions complete and unreviewable authority to aid business groups to frustrate its primary objective. For if business groups, by combining with labor unions, can fix prices and divide up markets, it was little more than a futile gesture for Congress to prohibit price fixing by business groups themselves. *Id.* at 809–810, 65 S.Ct. at 1540.

The Court went on to reaffirm the principles of *Apex Hosiery* and *Hutcheson* that most labor union activities, while they restrain trade, have been lifted out of the Sherman Act and that the Act draws no distinction between the restraints affected by violations and those achieved by peaceful means with the resulting maxim that courts were not to determine a union's exemption by the wisdom or unwisdom or the rightness or wrongness of the end sought by the unions.

In recent years the Supreme Court has had to struggle with the problem of balancing these recognized congressional objectives. Two cases decided the same day which involve this issue of a union's antitrust exemption sufficiently illustrate the difficulty the Court has had in trying to reconcile and accommodate policies which must obviously conflict at some point.

In United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L. Ed.2d 26 (1965), small independent coal producers instituted a Sherman Act attack against the Mine Workers alleging that through an industry-wide collective bargaining agreement setting a minimum wage scale the union and large coal mine operators had conspired to establish production costs so high that small producers would be driven from the market leaving a monopolistic situation for the large producers. The Court, with three fragmented opinions,[4] held that the small coal miners had stated a cause of action under the antitrust statutes. In the opinion of the Court, Justice White reaffirmed the mandate of *Hutcheson* which forbade unions from conspiring with employers to eliminate competition. The Court reaffirmed its earlier conclusion that Congress had recognized unions as a legitimate anticompetitive organization while recognizing that unions might demand the same settlement from all employers in an industry as long as that demand was based solely on internal policy decisions by the union. The Court held that unions forfeited their antitrust immunity when:

> It is clearly shown that [the union] has agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of

---

4. Justice White delivered what was styled as the majority opinion, with Chief Justice Warren and Justice Brennan concurring in his opinion. Justice Douglas, with Justices Black and Clark agreeing, concurred with an opinion. Justices Goldberg, Harlan and Stewart dissented from the opinion but concurred in the result.

employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy. This is true even though the union's part in the scheme is an undertaking to secure the same wages, hours or other conditions of employment from the remaining employers in the industry. 381 U.S. 665–666, 85 S. Ct. 1591.

In his concurrence, Justice Douglas relied heavily on *Allen-Bradley* and the participation by a union in a scheme to create a monopoly for employers. The special opinion of Justice Goldberg is discussed more fully below.

As noted, on the same day the Court issued another opinion concerning the relationship of labor unions to the antitrust laws. Meat Cutters Union v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). Again the Court split into the same three camps evident in *Pennington* with the factions led by Justices White and Goldberg reaching the same result through separate analyses, but with Justice Douglas' group dissenting with a separate opinion.

The Chicago area meat cutters had obtained collective bargaining agreements with an association representing virtually all retail food outlets which restricted the hours for sale of fresh meat to the period between 9:00 A.M. and 6:00 P.M. *Jewel Tea* signed the agreement under protest and then instituted antitrust action alleging that this restriction unduly restricted competition because it prohibited markets the choice of continuing to retail meat, even pre-packaged meat, after 6:00 P.M. They alleged the ability to retail after 6:00 P.M. was an important competitive device and that it was not sufficiently connected with union aims to avoid antitrust prohibition.

In an opinion for three Justices, Mr. Justice White first pointed out that in this case there was absolutely no issue remaining of a union-employer conspiracy and framed the question thusly:

It is well at the outset to emphasize that this case comes to us stripped of any claim of a union-employer conspiracy against Jewel. The trial court found no evidence to sustain Jewel's conspiracy claim and this finding was not disturbed by the Court of Appeals. We therefore have a situation where the unions, having obtained a marketing-hours agreement from one group of employers, have successfully sought the same terms from a single employer, Jewel, not as a result of a bargain between the unions and some employers directed against other employers, but pursuant to what the unions deemed to be in their own best interest. 381 U.S. at 688, 85 S.Ct. at 1601.

Apparently taking the position that the absence of proof of a conspiracy was not fatal to the plaintiffs, Justice White turned to consider whether the agreement over hours of operation sought by the union could be termed a "legitimate union interest". To determine whether or not this demand could be so characterized, Justice White turned to "consider the subject matter of the agreement in the light of the national labor policy." *Id*. at 689, 85 S.Ct. at 1601.

In pointing out the factors which he felt were controlling on this issue, Justice White stated:

The crucial determinant is not the form of the agreement—e. g., prices or wages—but its relevant impact on the product market and the interests of union members. *Id*. at 690, n. 5, 85 S.Ct. at 1602.

He then goes on to evaluate the union's demand and determine that the union had a legitimate interest in seeking this restriction from the employer, despite its strong anticompetitive result.

In a lengthy concurrence in the result in *Jewel Tea*, which also served as a concurrence in *Pennington*, Justice Goldberg expounded on what he felt was the proper view of the balance to be struck between labor unions and antitrust law. Justice Goldberg's basic complaint with

Justice White's opinion centered on his belief that continued intervention by courts under the guise of antitrust was nothing more than a throwback to the days when courts with impunity had substituted their own economic judgment for the balances struck by Congress. He points out that Congress has repeatedly amended the labor laws, not the antitrust laws, to cover activities which it has found in its legislative judgment to be detrimental to the public interest.

A distillation of his position illustrates that he feels Congress has removed from the courts the power to review labor-employer agreements wherever that involves passing on the economic judgments contained therein. While he disagreed with the use of the conspiracy test, he still added: "Even if an independent conspiracy test were applicable to the *Jewel Tea* situation, the simple fact is that multi-employer bargaining at arm's length does not constitute union abetment of a business combination." 381 U.S. at 726, 85 S.Ct. at 1623. Justice Goldberg, thus, takes the position that where no conspiracy is alleged there can be no antitrust violation.

In a short dissent, Justice Douglas argues that the collective bargaining agreement itself was evidence of a conspiracy between the retailers and the union. Relying heavily on what he considered the true teaching of *Allen-Bradley*, Justice Douglas took the position that the contract constituted an antitrust violation because of the multi-employer aspect of the agreement. Since this multi-employer contract establishes an agreement between competing employers which they could never enter on their own, Justice Douglas rejects the idea that the presence of the labor union will immunize the agreement. He states:

> The unions here induced a large group of merchants to use their collective strength to hurt others who wanted the competitive advantage of selling meat after 6 p. m. Unless Allen Bradley is yet overruled or greatly im-

paired, the unions can no more aid a group of businessmen to force their competitors to follow uniform store marketing hours than to force them to sell at fixed prices. Both practices take away the freedom of traders to carry on their business in their own competitive fashion. 381 U.S. at 737, 85 S.Ct. at 1607.

■ Thus, after *Jewel Tea*, there appears to be arguably a two-fold test for determining a union's antitrust exemption. It is clear that wherever the complaint alleges a conspiracy between labor and non-labor groups to injure the business of another non-labor group the exemption is not available. Justice White's opinion in *Jewel Tea* suggests that even where there is no allegation of conspiracy the union cannot claim exemption from the antitrust laws if the agreement it seeks does not encompass a "legitimate union interest". We will discuss each of these as they relate to the facts presented in this case.

## V

Prior to *Jewel Tea*, the Supreme Court cases such as *Allen-Bradley* suggested that the sole test to be applied in determining a union's antitrust exemption was whether or not the labor union had entered into a conspiracy with non-labor groups to achieve the sort of anti-competitive arrangement for those business groups which Congress had expressly addressed in the antitrust laws. Since the *Jewel Tea* decision this court has had an opportunity to address the conspiracy element of a union's antitrust exemption.

In Cedar Crest Hats, Inc. v. United Hatters, 5 Cir. 1966, 362 F.2d 322, this court set forth its interpretation of the conspiracy test:

> In order for union activity to constitute a violation of antitrust laws in the circumstances here presented, there must be a combination of union and nonunion business groups to create a monopoly, resulting in a restraint of trade or interstate com-

merce . . . . In other words, the union must join in a conspiracy *to create a monopoly among fellow-conspiratory business interests.* This interpretation is reinforced by the statement of Mr. Justice Black in Allen Bradley at 325 U.S. 809, 65 S.Ct. 1539, 89 L.Ed. 1948, that "Employers and the union did here make bargaining agreements in which the employer agreed not to buy goods manufactured by companies which did not employ the members of Local 3. *We may assume that such an agreement standing alone would not have violated the Sherman Act.*" (Emphasis added). We, in turn, may assume that where a union acts solely in its own self-interest and makes no attempt to create a monopoly there is no antitrust violation. *Id.* at 326.

Furthermore, in *Cedar Crest* this circuit, in an opinion by Judge Gewin, stated that in order to maintain an antitrust action against the union it is necessary to "prove facts showing that the Union conspired with certain business interests to create a monopoly for such business interests." *Id.* at 327.

The complaint of Connell in this case contains no allegation of this union's participation in a scheme or conspiracy with a non-labor group to create a monopoly for that non-labor group. In fact, Connell bases its claim on the ground that this contract simply restricts the way in which it is free to carry out its business. It is Connell itself which is alleging serious injury from the agreement despite the fact that it is indeed the sole non-labor party to the agreement. There is no allegation of any conspiracy between the union and unionized subcontractors nor does the proof allude to any such conspiracy. In fact, at trial counsel for the union directly cross-examined the employer's witness in chief, Mr. Thomas Stewart, president of Connell Construction, on the point of a union conspiracy. The following colloquy took place:

Q Do you recall the taking of your deposition? Do you, Mr. Stewart?

A Yes.

Q I asked you at that time if you had any information whether Local 100 had reached some understanding, or entered into some conspiracy with mechanical contractors in the area to try to drive Texas Distributors, or anyone else, out of business. Do you recall me asking you that question?

A Yes.

Q And what was your answer to it?

A Not to my knowledge, I believe.

Q You have no information concerning anything like that?

A No.

Q I asked you at the time of your deposition whether you had any information, direct or indirect, of the existence of a plan, or agreement between Local 100 and other contractors, whether they be general contractors, or mechanical contractors, whereby Local 100 will undertake to create a monopoly in the Dallas area for certain contractors. Do you recall me asking that question?

A Yes.

Q And what was your answer if you recall?

A "Not to my knowledge."

Q And that is your testimony today?

A Yes.

Further questioning by Connell's own counsel established clearly that plaintiff was basing its entire case on the theory that there was a sufficient antitrust violation because the union had restricted Connell in the way that it carried on its businsss. The only mention of conspiracy denominated Connell as the sole non-labor conspirator.

■ Such a conspiracy allegation is clearly not the kind which faced the Su-

preme Court in *Pennington* and the other antitrust conspiracy cases. The only non-labor group with which the union is alleged to have "conspired" is the very party who now tries to bring the antitrust suit alleging serious injury. This seems to be strong evidence that at least with regard to the contract with Connell, the union was acting in its own self-interest and that no monopoly was being formed with Connell, the only non-labor group with whom the union is alleged to have "conspired". Therefore, Connell has made out no sufficient claim of conspiracy to get beyond the union's antitrust exemption. We are thus left with a situation quite similar to *Jewel Tea* in that, once the conspiracy to monopolize drops out, the only remaining claim of plaintiff is that the agreement interferes with his right to conduct his business as he wishes and that the contract requires him to forego certain methods of competition.

### VI

From the thicket of *Jewel Tea*, a lower court is left with a feeling that mere failure to allege and prove conspiracy does not mean that labor's exemption from the antitrust laws automatically applies. As pointed out, the disparate opinions in *Jewel Tea* make it difficult to draw conclusions as to the concensus of the Court on this issue. Since *Jewel Tea*, the Court has decided one case in which it considered the problem of legitimate union interest in the context of an antitrust complaint.

In American Federation of Musicians v. Carroll, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), the Court was presented with a situation in which several orchestra leaders sued the musicians' union alleging that union restrictions on their ability as independent contractors to deal with third parties seeking their services violated the antitrust laws.

The Supreme Court, in an opinion by Mr. Justice Brennan, held that due to the community of interests and possible inter-competition between the band leaders and union members, the setting of uniform prices by the union and the agreement thereto by the orchestra leaders did not violate the antitrust laws. The question of possible conspiracy with a non-labor group was found not relevant as the Court held that the orchestra leaders were themselves a labor group for the purposes of the Norris-LaGuardia Act. The Court then turned to the question of legitimate union interest with regard to the union's price setting. Pointing out that the crucial determinant was the impact which the price setting had on the union's membership, the majority found the activity protected. The Court indicated that such an agreement was necessary to protect the wages and other legitimate concerns of the union members because undercutting by the independent contractor-orchestra leaders generally led to a "skimping" on the amounts paid the member musicians.

Justice White, joined by Justice Black, dissented in an opinion stressing that the benefit to the union members was to be weighed against the anticompetitive impact of the agreement when evaluating the scope of a legitimate union interest. He felt that the elimination of price competition was too great despite the union's legitimate interest in not having orchestra leaders undercut wages to musicians. It is obvious that one of his major concerns was that, by dictating the price to be charged, the union here eliminated all normal competitive devices available to the independent contractor-orchestra leaders, including those competitive advantages not directly based on wages paid and work standards of union members. In short, the union practice of setting a minimum price floor eliminated from certain leaders the right to use competitive devices to cut the price lower even though such reductions in prices could conceivably have been obtained without corresponding reductions in wages or working conditions of union members.

██ We now must evaluate the "legitimate union interest" test as it ap-

plied to what the plumbers' union was seeking from Connell in this case. At the outset, we note that elimination of that part of competition based on differences in wages and other labor standards has long been recognized the primary objective of any national labor organization. See Apex Hosiery v. Leader, 310 U.S. 469, 503–504, 60 S.Ct. 982, 84 L.Ed. 1311,; Mine Workers v. Pennington, 381 U.S. 657, 666, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); American Federation of Musicians v. Carroll, 391 U.S. 99, 106, 88 S.Ct. 1562, 20 L.Ed.2d 460. Such a conclusion, of course, flows from the very nature and history of the organized labor movement. All labor unions tend to limit competition to the extent that they raise wages and labor standards forcing employers to either raise prices to cover the costs of increased standards or to use other competitive devices which are not directly tied to wages or conditions of work. All labor unions have a legitimate interest in the elimination of that component of competition which is based on differences in labor standards.

■ Is the union in this case seeking an agreement involving a legitimate union interest? We feel it clearly is. In the *Pennington* and *Allen Bradley* cases, the Court did not have to face this question because the allegations sufficiently presented a claim of conspiracy to create a monopoly for non-labor groups. That was not the case, however, in *Jewel Tea* and *American Federation of Musicians* where the conspiracy elements were no longer viable.

■■ The plumbers' union is simply seeking to eliminate competition based on differences in labor standards and wages. Even if the construction unions involved herein were to obtain contracts from every general contractor and subcontractor in the area, so long as there were no allegations of conspiracy to prohibit new entries or to otherwise create a monopoly for the signatory non-labor interests, the antitrust exemption cannot be lost because of the legitimate union interest underlying this agreement. In this regard it is extremely important to realize that the legitimate union interest requirement does not have to be considered until such time as the conspiracy allegations, if any, have been found to be unavailable as a grounds for removing the exemption. Thus, most of the evils which can result from such market closing schemes as were found in *Allen Bradley* can simply be covered under the conspiracy rubric. Even legitimate union interest cannot serve to exempt a union from antitrust sanctions when in securing that legitimate goal the union agrees to a market allocation or other conspiracy to create an unfair business advantage for the non-labor parties. That is the clear teaching of *Allen Bradley* and *Pennington* but, as noted, that is not the situation which Connell presents at this point in time.

The central reason that the union wants the agreement sought in this case is that it will be helpful in organizing other subcontractors. The direct relation of this type agreement to that goal is clear. These agreements tend to eliminate any edge that a nonunionized subcontractor has in bidding on a job when that competitive edge rests solely or primarily on the fact that he pays less wages or grants lower working standards than a unionized subcontractor. Thus, the achievement of a contract such as the one here with Connell gives the union a strong weapon in its quest to unionize other subcontractors.[5]

5. At this point the countervailing arguments with respect to freedom of choice of the employees and the argument that nonunion contractors provide a legitimate anti-inflationary function by helping hold down wages unions would otherwise demand if they had an entire industry sewed up are, indeed, very difficult questions which have to be faced, but the instant question is whether or not they are to be faced in this suit. These policy concerns are of a type dissimilar to the rationale underlying antitrust policy. These arguments are far more germane to labor law issues. Assuming, as we must, that Congress truly meant

It is clear in this case that the union is trying to get around an inherent situation which has long been recognized as making the construction industry unique in the field of labor relations. The core of this problem stems from the fact that work in the construction industry is ambulatory in nature and that there is a decided lack of continuity between the various parties—owner, general contractor, subcontractor, and employees—who are related to an individual project. The owner, of course, is basically the money source for the job which, by its nature, is obviously intended to be completed in a limited duration of time. The general contractor, with or without employees of his own, is the one who is actually in charge of getting the job done. As a general rule, the general contractor hires subcontractors, usually on the basis of competitive bids, who actually perform that construction which his own employees do not do. These subcontractors are independent businessmen and their relationship to the general contractor is limited to the duration of the job on which they are the successful bidder. The subcontractors have their own employees and in most instances the subcontractors are the immediate employers with whom the union has to deal.

Thus, the union is faced with a fairly difficult problem because of the impact that the isolated general contractor has on the labor relations of the independent subcontractors. A permanent relationship with the subcontractor does not in any way ensure the union of a permanency of available work and thus differs from manufacturing where there is far more continuity between the parties dealing with the union and the ones in control.

It can be readily seen that construction unions have a direct interest in seeing that general contractors hire subs using union labor much as it is obvious that the hatters had a strong interest in seeing retailers buy for resale only union-made hats.

In *Jewel Tea*, Justice White's group found that the hours of marketing meat —even pre-cut meat—was a legitimate concern for the butchers' union that allows restriction on use of a competitive device which is obviously only remotely related to a union's primary aim. The agreement the union sought from Connell, however, is directly related to work attainment, work preservation, and other labor standards which directly benefit the members of the union involved. Just as in *Jewel*, the aims of the union in *American Federation of Musicians* were not nearly as related to direct union benefit as are the terms sought from Connell, yet in each of those cases the Supreme Court found that the terms of the agreement sought were sufficiently related to the elimination of competition based on wage and standard differences that the antitrust exemption was available.

Even if the anticompetitive aspects are weighed against the direct benefit as Justice White suggests they should be in his *Jewel Tea* opinion and *American Federation of Musicians* dissent, it would be difficult to find these goals illegitimate. First, it is clear that in section 8(e) Congress explicitly recognized the legitimacy of these restrictions on subcontractors wherever the general contractor had unionized employees of his own. The *anticompetitive* effect does not change that much where the general contractor has no employees of his own. Of course, the situation may differ when

to approve elimination of that competition based on differences in labor standards and wages and insulate such a result from antitrust attack absent a conspiracy to monopolize, it becomes clear that other public policies, such as freedom of choice, are to be protected in an alternative manner.

As will be discussed *infra*, it seems that Congress has indeed tried to maintain all competing policies which Connell seeks to have apply. In doing so, however, Congress has chosen to act through the specific labor statute, not under the more general antitrust laws.

all general contractors have agreed. However, it still remains that the only anticompetitive aspect is that the unions have succeeded in eliminating that feature of competition based on lower standards or wages. There remain numerous other competitive devices. Furthermore, if the unions set wages so high that marginal and smaller employers are forced out of business the specter of a *Pennington* conspiracy should be sufficient to prevent this result. Finally, Congress always has the option of restriking the balance.

What this all comes down to is the realization that antitrust is not the proper method of handling this problem as it is presented in the complaint.[6]

## VII

At this point is seems necessary to consider how the element of legitimate union interest is affected by the form in which the challenged agreement is obtained. In short, does it matter for purposes of the antitrust laws in a case where no conspiracy to monopolize is alleged that the agreement entered into or the method that agreement was achieved may possibly be an unfair labor practice? We think not.

It is not clear here whether or not the contract involved in this case is protected by the labor laws, prohibited by the labor laws, or in some way not spoken directly to by Congress in the labor laws. The union argues that this contract is expressly protected by section 8(e) of the National Labor Relations Act. The company maintains that Congress never intended that provision to reach the precise situation presented by this case. Detailed study of relevant Board and court opinions fails to illuminate any cases in point. There are several cases which imply a resolution one way or the other but these are somewhat conflicting. We can say with some assurance that the Board has not clearly ever ruled on this precise situation. We do not have to face the question of whether or not this activity is prohibited, protected, or not reached by the labor laws if that issue is immaterial to an antitrust suit.

Consideration of the options open to the court following determination of whether this is an unfair labor practice or outside the statute illustrate that such a course is perilous when antitrust sanctions are involved. If we were to determine that this activity was protected there would, of course, be no cause of action in antitrust. However, we would have usurped a Board prerogative for unfair labor practices are to be considered in the first instance by the expert administrative body established by Congress.

If we decided that the activity was indeed an unfair labor practice, in addition to usurping Board prerogative, we would be faced with the difficult question of fashioning a remedy. We have no jurisdiction to grant remedies under the labor statute, especially in a suit under antitrust laws. Yet Congress has specifically taken cognizance of agreements such as this in the labor laws and has provided a set of sanctions to be applied for violation of those rules. In short, if we find this activity an unfair labor practice we will be deciding that Congress has directly addressed this

---

6. In his *Jewel Tea* opinion, Justice Goldberg specifically pointed to the problem facing courts in applying the broad Sherman Act provisions:

. . . Union restrictions on contracting out and subcontracting of work are delineated by § 8(e) of the Act. For the issue presently before us, it is most significant that in enacting this last prohibition, Congress in the exercise of its legislative judgment, specifically excepted the unusual situations existing in the garment and building industries. Such exemptions for particular industries, which may be proper subjects of legislative discretion, would, of course, be most difficult for courts to make in employing a broad proscription like the Sherman Act.

We might add that construing the meaning of such a legislatively-created labor law exception in the context of an *antitrust* action is equally, if not more, difficult.

question and decided how the balance of interest between labor and management is to be struck in the public interest. But no where has Congress ever said that a violation of the labor laws should give rise to treble antitrust damages, possible criminal punishments, and attorney's fees for the plaintiffs. Yet, allowing this suit to continue as an antitrust action merely because a violation of the labor laws was found would involve those punishments.

We note that in Apex Hosiery v. Leader, *supra*, the Supreme Court refused to allow an action in antitrust even though the union in that case used violent and illegal means to achieve its goal of the then permitted union shop. The Court indicated that the method of achieving the ultimate goal, no matter how disruptive of commerce or how violative of public order, could serve to give federal jurisdiction where the agreement or ultimate goal of the union was lawful.

The following language from a dissenting opinion by Justice Stewart, joined by Justices Black, Douglas and Clark, in Woodwork Manufacturers Association v. N.L.R.B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), supports the conclusion that legitimate union interest is not controlled by legality of the activity under the labor laws:

> Legitimate union objectives may not be accomplished through means proscribed by the statute. *Id*. at 651, 87 S.Ct. at 1271.

This statement obviously illustrates what the true relationship between the union's legitimate aims and the labor laws is. In essence, it states that Congress in the labor laws was striking a balance between the public interest and the achievement of the goals of organized labor. Some weapons it found too powerful to leave in the hands of labor in seeking to achieve uniformity of wages and standards. Outlawing the means in no way outlawed the goal.

Therefore, it cannot be said that the commission of an unfair labor action in this case, if one has indeed been committed, violates the antitrust laws.

Even if our construction of the statute and congressional intent were to indicate that this activity fell without the statute completely[7], there would still be a very difficult question of whether or not antitrust remedy was available. As we have noted, there is no allegation of conspiracy here nor is there any real showing that the union does not have a purely legitimate interest in obtaining this contract which would directly benefit its members. There are some things which Congress has left to sheer economic power in the labor-management area. If this case, framed as it is without the usual antitrust allegations, were to be allowed there would be a chance that the courts were trampling on an area left intentionally unregulated by Congress. Furthermore, a general policy of regulating such activities might spill over into areas where it was relatively clear Congress had intended raw economic power to govern.

 The above analysis amply illustrates that for antitrust purposes the term "legitimate union interest" is not controlled by whether or not the goal sought or the methods used in attempting to reach that goal violate the ground rules for labor relations set forth in the NLRA. If and when those ground rules are violated, punishment must come through the procedures and in the manner specified by Congress in the labor laws. Absent a viable conspiracy allegation, a union retains its exemption from antitrust attack so long as the terms of the agreement it seeks are designed to benefit its members in the hours, conditions, and other immediately relevant concerns of the working man.

The union here is seeking a weapon in its battle to eliminate competition based on differences in wage and labor stand-

7. Our consideration of the precise sections of the National Labor Relations Act leads us to the conclusion that this activity, if not expressly protected by the statute, is conclusively prohibited. This is discussed in Section VIII, *infra*.

ards. It might be argued here that this agreement with Connell goes further because it restricts agreements to unionized subcontractors, not just to those who pay union wage scale. However, this would be true in all cases of union activity because the primary way to eliminate these differences is through unionization of all the employees in a particular industry. Furthermore, unionization of all the employees in an industry has itself always been recognized as a proper goal of labor organizations.

 It has long been established that labor unions have a clear right to approach and, in some ways, "persuade" consumers and other third parties from using or dealing in non-union-made goods, despite the fact that these actions restrict full and free competition. In *Cedar Crest Hats*, the agreement between the merchant and the union that the merchant would no longer sell non-union hats is a restriction on that merchant's freedom to deal with some manufacturers. The only element in that case subject to antitrust attack is the agreement not to deal. Here, Connell stands in the same position as that hat manufacturer. He has been "convinced" to agree not to deal with certain subcontractors. From the point of view of the affect of such an agreement on competition, the restrictions on his right to do business as he desires are the same no matter what his reasons for making such an agreement are. If Connell and another general contractor agree not to use a certain sub to drive him out of business, the anticompetitive effects of the agreement are obviously just as if the hat merchant had entered an agreement with other merchants to boycott a certain manufacturer because of some trade practice.

This court, in *Cedar Crest*, held conclusively that there was no antitrust action there. From the standpoint of restriction on competition there is no difference between *Cedar Crest* and Connell. Both the agreements are anticompetitive to a certain extent. Why, then, can there not be attack? The simple answer is that absent allegations of conspiracy to create a monopoly for some business interest, the competing policy favoring unionization insulates the agreement. The reason the agreement is insulated stems from the fact that the union is acting only in its self-interest in pursuit of a goal long recognized as basic to every labor organization. The unions in *Cedar Crest* had no lasting relationship with the hat merchant; they did not and could not represent any employee of his. Yet they were seeking to unionize hat manufacturers with whom he dealt and in furtherance of that objective they elicited a promise from the merchant to boycott those with whom they had a dispute. The unions in Connell have done no more or not less from the point of view of impact on the competitive market.

There are only two possible differences between *Cedar Crest* and Connell. First, there was a written contract in Connell, not just an agreement, but anyone familiar with antitrust law will recognize that an antitrust violation can certainly occur where there is no more than a understanding among the parties. Secondly, the agreement in *Cedar Crest* was obtained without violation of the labor laws, but, as we have shown above, the legality of the method of securing the agreement under the antitrust laws is germane to the antitrust aspects.

Therefore, we are convinced that the complaint before the district court in this case was insufficient to avoid application of the union's exemption from general antitrust attack.

## VIII

At this point it has become patently obvious that this is a labor law, not an antitrust, controversy. Our in depth consideration of the National Labor Relations Act in connection with this case has satisfied this court that Congress has spoken directly to the activities of this union in this case in that statute. Under the allegations of Connell's complaint, if the union's conduct is not ex-

pressly protected in section 8(e) of the Act, then it is expressly prohibited by that section or other sections of the Act. We see no conceivable way that this coercion to sign this agreement can escape provisions of the labor laws.

Section 8(e) of the National Labor Relations Act [8] prohibits what are popularly known as "hot cargo" clauses. These clauses were used by unions, prior to the amendments banning their use in 1959, as a form of secondary pressure against those with whom the union had a dispute. It enabled the union to seriously damage an employer's business by forcing others who dealt with that employer on a regular basis to cease doing business with him.

In 1959, Congress determined that this was simply too powerful a weapon and too subject to abuse for it to be allowed. In banning these hot cargo clauses, however, Congress left exceptions to the ban for two industries—construction and garment. The construction exception was limited to work to be performed at the job site.

The classic hot cargo agreement was merely a clause in an otherwise valid collective bargaining contract between an employer and the union which represented his employees. It generally stated that the employer would not deal with any product of another employer with whom the union had a dispute. In a manner of speaking, it was philosophically justifiable to have such a clause in order to prevent the members of a union from having to handle, distribute or otherwise deal with the goods of an employer with whom their union was having a dispute and against whom their union was applying economic pressures. As noted, Congress rejected this argument and banned these clauses, except for the garment and construction industries.

Plaintiff Connell is clearly engaged in the construction industry, and at first blush it would appear that the union activity in this case is protected by the section 8(e) proviso. In arguing for the non-applicability of the proviso, however, Connell has stressed that the agreement sought by the union is not a classic hot cargo clause because there exists no bargaining relationship between this union and Connell. In short, Connell argues that the proviso is inapplicable, construing the term "any employer" to mean only the immediate employer of the employees represented by the union. The construction placed on that term, which must be derived from an intimate knowledge of labor relations in the construction industry and full awareness of congressional goals in the 1959 amendments, will be dispositive of the legality of the union's conduct.

If it is determined that "any employer" includes one in the position of Connell, the activity is protected. If that term is held to *not* reach Connell, at first glance it would appear that Congress has left the conduct unregulated in the labor laws.[9] However, there is another section of the Act which would apply to govern the union's conduct.

8. (e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection (e) shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work.

9. If the word "employer" is read to exclude Connell in the proviso, then it seems that the word "employer" in the general ban of section 8(e) would have to be read in the same manner, thus, leaving this activity totally unregulated by this section of the statute.

Section (b)(4)(ii)(B) makes it an unfair labor practice to:

threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is forcing or requiring *any person* . . . to cease doing business with any other person. (Emphasis supplied).

It should be noted at the outset that this section applies to "any person" and is not restricted only to employers. The union picketing in this case would clearly come within at least the term "coerce". It may be enough that the contract "restrains" Connell to make its continued existence a violation of this section. Furthermore, it is certainly clear that the contract requires Connell to cease doing business with other persons. Unless the union can fit itself within 8(e), it would seem unquestionable that the union is committing an unfair labor practice under this section.

The leading case on the interpretation of section 8(b)(4), N.L.R.B. v. Servette, Inc., 377 U.S. 46, 84 S.Ct. 1098, 12 L. Ed.2d 121 (1964), is valuable in illuminating the delicate differences which Congress has sought to recognize while broadly legislating against secondary activity. The delivery drivers' union was engaged in a strike against *Servette,* a wholesale distributor. To bring additional pressure on *Servette,* union representatives asked the managers of food chains to cease handling products distributed by *Servette.* These "requests" were generally presented with warnings that failure to agree would result in publicity leafleting in front of the markets. The NLRB dismissed unfair labor practice charges and the Supreme Court affirmed. It is interesting to note that the union's conduct in *Cedar Crest Hats* parallels the conduct in *Servette.*

In finding this activity protected, the Supreme Court noted that section 8(b)(4)(i) banned even inducement or encouragement of any individual employer by another seeking that such individual refuse to handle the goods of another employer. It held that the managers were only being encouraged to use managerial discretion and were not being encouraged to refuse to do their jobs. Pointing out that the 1959 amendments were designed to close various loopholes in the earlier bans against secondary boycotts, the Court stated:

Moreover, the division of § 8(b)(4) into subsections (i) and (ii) by the 1959 amendments has direct relevance to the issues presented by this case. It had been held that § 8(b)(4)(A) did not reach threats of labor trouble made to the secondary employer himself. Congress decided that such conduct should be made unlawful, but only when it amounted to conduct which "threaten[s], coerce[s] or restrain[s] any person"; hence the addition of subsection (ii). The careful creation of separate standards differentiating the treatment of appeals to the employees of the secondary employer not to' perform their employment services, from appeals for other ends which are attended by threats, coercion or restraint, argues conclusively against the interpretation of subsection (i) as reaching the Local's appeals to the supermarket managers in this case. If subsection (i), in addition to prohibiting inducement of employees to withhold employment services, also reaches an appeal that the managers exercise their delegated authority by making a business judgment to cease dealing with the primary employer, subsection (ii) would be almost superfluous. *Harmony between (i) and (ii) is best achieved by construing subsection (i) to prohibit inducement of the managers to withhold their services from their employer, and subsection (ii) to condemn an attempt to induce the exercise of discretion only if the inducement would "threaten, coerce, or restrain" that exercise.* (Emphasis added and footnotes omitted). 377 U.S. at 53–54, 84 S.Ct. at 1103.

■ We see no way that if Connell cannot be termed an employer within

8(e) the union can escape the application of this subsection because without the protection of 8(e) the union's activities become a classic example of secondary activity. As we have previously pointed out, we do not have original jurisdiction to determine unfair labor practices. That rests with the labor board. We are convinced that it is the labor board which must decide this issue. Having illustrated that antitrust is not the proper vehicle for this case as it is currently alleged, and having shown that this activity is undoubtedly either prohibited or protected by the labor laws in quite specific provisions, it becomes obvious that the Board has exclusive jurisdiction to decide in the first instance what Congress meant in 8(e) and 8(b)(4).[10]

Connell points to the K.A.S. case referred to earlier, in which the General Counsel refused to issue a complaint against picketing to obtain an agreement such as this, as an example that the Board is refusing to hear such complaints. First, Connell has never attempted to take its specific situation to the Board and it has never been turned down by the General Counsel. We do not have the full facts of K.A.S. before us. Even if the Board refused to take K.A.S. or a similar charge brought by Connell, we are not convinced that this should give rise to an antitrust action.

▬▬ Because of the continuing nature of the restraint involved, we feel that Connell might be within the time provision for filing charges under the National Labor Relations Act. At least it could certainly try. Even if the Board refused to consider the charges in a way that Connell could ultimately seek and obtain court review, there appears an available method for securing court determination on the legality of this contract without the necessity of allowing it to be brought as an antitrust suit to get such review. The option is always open to Connell to violate the provisions of this contract which it feels are not protected by the labor statutes. It is well-settled that while a union in the construction industry may strike to obtain such a contract clause, once that clause is violated a union may not strike to enforce it. The union's only available remedy is a suit under section 301 for damages. See, e. g., Local 48, Sheet Metal Workers v. Hardy Corporation, 5 Cir. 1964, 332 F.2d 682. Connell could raise in defense its claims that the contract itself or the manner in which it was achieved violate labor law and policy. This, of course, risks some penalty as the result of an adverse legal finding. However, this alone is not sufficient to create an action in antitrust as a vehicle for testing the statute.

The union has argued that precedent conclusively establishes that this activity was undeniably protected by the NLRA. Our detailed study of Board and court opinions leaves us with the feeling that this precise issue relating to the meaning and interpretation of section 8(e) has never been given a full and complete treatment by either the Board or a court. We are not unmindful of the Board's adoption of the Administrative Law Judge's decision in Los Angeles Building and Construction Trades Council (Church's Fried Chicken, Inc.), 183 N.L.R.B. 102. However, we do not feel that that rather enigmatic opinion is sufficient to be dispositive of the issues raised in this case. We feel quite strongly that the Board should take and consider this issue fully at the next available opportunity. Its resolution

10. Since we have determined that there is no antitrust cause of action in this case as it is alleged, we do not find it necessary to pass on whether or not Congress, by the 1947 and 1959 amendments to the NLRA, intended to automatically preclude antitrust attacks for secondary boycotts even when a more traditional *Allen Bradley* conspiracy is alleged. In this regard see the opinion of Justice Goldberg in *Jewel Tea*, 381 U.S. 708, n. 9, 85 S.Ct. 1596, and the comments of Justice Stewart in his dissent in *National Woodwork Manufacturers*, 386 U.S. 652, 87 S.Ct. 1250 et seq.

will have significant impact on labor relations in the construction industry. Repeated attempts by an administrative body to avoid resolution of a difficult issue may constitute an abuse of discretion. See *Templeton v. Dixie Color Printing Co.*, 5 Cir. 1971, 444 F.2d 1064.

Thus, we have concluded that on the basis of the allegations presented in this suit, there is no cause of action for Connell in antitrust. As our opinion illustrates, we do not feel we have jurisdiction to directly decide the complex labor issues underlying this dispute. We feel that if Connell desires adjudication of these matters there are adequate methods for securing such a determination without resorting to a possible warping of the antitrust laws.

## IX

██ Having disposed of any claim under the federal antitrust statutes, we turn to consideration of the sole remaining issue—the possibility of recovery under state antitrust laws. After careful consideration, we hold that state antitrust laws cannot be applied to this activity because of preemption by federal law. We note here that Connell has argued that the federal antitrust statutes do not necessarily preempt application of state antitrust statutes. However, it is not the federal statutes pertaining to antitrust which we feel are controlling here. Rather, as we have previously pointed out, the dispute in this case is unquestionably a labor law issue. It is the body of federal labor law, primarily enunciated in the National Labor Relations Act, which we feel preempts the possible application of state antitrust remedies to this situation.

As noted, the activity under challenge in this case is almost certainly either protected or prohibited by the Act. The reason that can be said is that there is a strong argument either way: that is, a strong case can be made for the position that this language in the National Labor Relations Act prohibits the union from obtaining contracts of the type chal-

lenged herein in this manner and also there is a strong argument for the proposition that the National Labor Relations Act specifically sanctions and protects such contracts. Having cast the controversy squarely within the realm of labor law, the state is not free to apply its own antitrust laws to activities so intimately intertwined with federal labor law and policy.

██ The rule is generally stated that whenever certain activity is either arguably protected or arguably prohibited by the National Labor Relations Act, only the National Labor Relations Board may make the initial determination whether the activity is protected, prohibited, or in the gap left without regulation by federal law. This rule was initially set forth in San Diego Building Trades Council v. Garmon, 357 U.S. 925, 78 S.Ct. 1371, 2 L.Ed.2d 1369 (1958), and has been recently reaffirmed. *Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). Despite many criticisms, including those voiced by the dissenters in *Lockridge, supra,* we feel that *Garmon* is still the law of the land on this issue. Thus, since it is obvious here that the activity in this case is in all probability either protected or prohibited by the National Labor Relations Act, we feel these decisions clearly establish that state antitrust laws cannot be applied to this situation.

For the reasons set forth in this opinion, we hold that the appellant has failed to remove this union's immunity from antitrust attack in this case. Therefore, the judgment of the district court, albeit on different grounds, is

Affirmed.

CLARK, Circuit Judge (dissenting):

While I expressly agree with what is implicit in the majority opinion—that the issues in this case are novel and important—with deference I cannot agree that a labor organization enjoys a vir-

tually total immunity from federal antitrust jurisdiction. Where, as here, a union local's activity not only constitutes a congressionally defined unfair labor practice—secondary boycott[1]—but also forces a business engaged in commerce to contract that it will refuse to deal with other firms whose employees are not controlled by the local, I find no bar to judicial relief. The end does not justify the means. The mere fact that the local desires to efficiently spread its organization of plumbing workers cannot legitimatize practices which cut across the business rights of neutral companies, the choice-of-representation rights of employees,[2] and the rights of other union groups who may wish to organize employer companies in this craft. Remitting the plaintiff here to an administrative remedy which has already been tried without success is unrealistic and remitting him to the partial remedy of an express statutory right to sue in damages,[3] is incongruous.

I would begin my reasoning by emphasizing that Plumbers Local 100 did not seek to force Connell, the object of its economic coercion, to employ union labor—either members of Local 100 or members of any other labor organizations. It had no present or future interest in any employee of Connell. Rather, through the use of picketing which effectively halted all of Connell's general contract work, Local 100 forced Connell to agree to withhold all mechanical subcontract work from subcontractors who did not have a collective bargaining agreement with Local 100. Through this indirect expedient, the union sought to extend its bargaining power to cover the employees of every plumbing construction firm in the market area in which Connell worked. This classic secondary boycott and the resulting work stoppage, relatively costless to the union in time, manpower, finances or side effects, but completely devastating to the general contractor, could have had only one result—Connell's capitulation and execution, under protest, of an agreement to refuse to do business with any subcontracting firm which did not employ members of this one local. Since no general contractor could withstand the pressure of having his entire work picketed, the meaning to everyone in the plumbing trade is clear—get in Plumbers Local 100 or get out of business. This scheme has separate but equally proscribed labor policy and antitrust effects. From the labor standpoint it deprives plumbing workers of the right to ballot for their bargaining representative, destroys interunion rivalry for representation rights, and embroils neutral employers in disputes in which they have no real interest. From the antitrust viewpoint, it clearly restrains trade by requiring general contractors to boycott plumbing contractors with whom Local 100 has been either unwilling or unable to secure a collective agreement.

Two distinct positions are advanced in support of the union's claim that its conduct, no matter how violative of the antitrust law, is immune from antitrust sanction: First, that its actions are protected by the provisions of the National Labor Relations Act—in particular the "construction proviso" to Section 8(e) of that Act; and second, that even if the secondary picketing and resulting agreement are not exempted by Section 8(e), it does not matter since labor organizations enjoy relatively complete immunity from antitrust regulation. My brothers pretermit consideration of the first and most strenuously guarded defense—the NLRA's sanction of secondary boycott action at construction sites—and predicate their opinion solely on the second defense—that the union activities here, legal or illegal, are immune from Sherman Act sanctions. With deference, I disagree, not just as to the method of

---

1. 29 U.S.C. § 158, particularly sub-sections (b)(4)(ii), (b)(7)(C) and (e).

2. 29 U.S.C. § 159.

3. 29 U.S.C. § 187.

decision, but as to result. Since in my view there is no *carte blanc* immunity, I must deal with the construction of 8(e) and I would hold that the unions defense urged there is not well taken.

*General Antitrust Immunity*—The rule which I discern from the existing authorities is two-fold. First, in spite of the general antitrust immunity with which Congress [4] and the courts [5] have sheltered the labor movement, union conduct, even where lawful under the labor statutes, may violate antitrust provisions if the union either combines with nonlabor groups or pursues nonlabor goals. The majority agrees with this. Second, union conduct which violates the labor laws may fall without the general antitrust immunity conferred by those laws if it is determined that the action which is labor law illegal also violates the antitrust laws.[6]

There are two principal bases in law as well as solid logic to support this conclusion. The post *Apex Hosiery-Hutcheson* legal developments are congressional action in adopting the Landrum-Griffin amendments in 1959 to the National Labor Relations Act and the Supreme Court's decision in Local 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). It comports with my sense of reason that anyone who mandates that another engage in restraint of trade by engaging in a labor practice condemned by Congress ought to be antitrust accountable.

I appreciate that the majority does not agree with my view of the manner in which the existing precedents should be construed and applied. However, if any common principle can be drawn from the *Jewel Tea* decision (looking both at views of Mr. Justice White, on one hand, and those of Mr. Justice Goldberg on the other) it is that at least some unilateral union activity, though described by the broad language of the Clayton and Norris-LaGuardia Acts, is without the scope of the labor antitrust exemption. Mr. Justice White expressed the view that union-imposed restrictions on the operating hours of employers would be immune to antitrust attack only if those provisions were so intimately related to traditional areas of labor concern, such as wages, hours and working conditions as to fall within the protection of the national labor policy. Mr. Justice Goldberg enunciated a broader exemption, extending to all mandatory bargaining subjects. Thus, no matter whose blend of *Jewel Tea* is thought to be more palatable, the court there confirms that some behavior declared legitimate by the earlier Clayton and Norris-LaGuardia Acts but proscribed by the National Labor Relations Act as subsequently amended falls without the antitrust exemption.[7] Since

---

4. Sections 6 and 20 of the Clayton Act (15 U.S.C. § 17, 29 U.S.C. § 52) and Section 4 of the Norris-LaGuardia Act (29 U.S.C. § 104).

5. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941).

6. Cedar Crest Hats, Inc. v. United Hatters, 362 F.2d 322 (5th Cir. 1966), is not to the contrary. There this court stated:
 [I]n order for union activity to constitute a violation of antitrust laws *in the circumstances here presented*, there must be a combination of union and nonunion business groups to create a monopoly, resulting in a restraint of trade or interstate commerce.

362 F.2d at 326 (emphasis added) (footnote omitted). In *Cedar Crest Hats* the court specifically found that the union activity was protected by the labor acts. Thus that case did not purport to consider antitrust immunity in the context of an unfair labor practice such as is present in Connell's case.

7. Arguably Mr. Justice White might even condemn some contractual provisions which were mandatory bargaining subjects if such provisions had only a remote and indirect effect on wages, hours, and working conditions. See Justice White's opinion at 381 U.S. at 689–690, 85 S.Ct. at 1602; and Justice Goldberg's concurrence, 381 U.S. at 727, 85 S.Ct. at 1623. *Compare* Teamsters Local No. 24 v. Oli-

even Justice Goldberg's broader opinion provides the basis for holding the local's activities not insulated from antitrust scrutiny, I premise my dissent on his opinion noting that Justice White's opinion supports my position, *a fortiori*.[8]

Justice Goldberg begins by updating *Hutcheson,* stating that:

> [T]he labor exemption from the antitrust laws dervies from a synthesis of all pertinent congressional legislation—the nature of the Sherman Act itself, §§ 6 and 20 of the Clayton Act, the Norris-LaGuardia Act, the Fair Labor Standards Act, the Walsh-Healy and Davis-Bacon Acts, and the Wagner Act with its Taft-Hartley and Landrum-Griffin amendments.

381 U.S. at 709, 85 S.Ct. at 1614 (footnotes omitted). This language evinces a clear recognition that the scope of antitrust immunity, which was once co-existent with the parameters of the Clayton and Norris-LaGuardia Acts, must be reexamined in the light of more recent congressional action. Moving from premise to decision and applying a mandatory/nonmandatory dichotomy, Justice Goldberg opined that the unfair labor practice of insisting upon a nonmandatory subject could in at least some cases constitute an antitrust violation.

The analogy between Justice Goldberg's paradigm of a loss of antitrust immunity and the case at bar is imperfect, since Justice Goldberg predicated his reasoning on union insistence on a nonmandatory bargaining subject within an established bargaining relationship, while here Connell and the union had no labor law duty to bargain at all. This lack of symmetry, however, strengthens my view that the union conduct is not antitrust immune. If a union would violate the rule set out by Justice Goldberg by insisting on one nonmandatory term in the course of engaging in labor law required bargaining, surely this local violated the same principle by insisting on the "Local 100 subcontractors only" contract when Connell had no duty to bargain whatsoever.

The principle that I draw from Justice Goldberg's opinion is that the union antitrust exemption dissipates if the union engages in an unfair labor practice and if the union activity is "at the core of the type of anticompetitive commercial restraint at which the antitrust laws are directed." 381 U.S. at 733, 85 S.Ct. at 1626. Justice Goldberg focuses on, but does not limit his opinion to, the most frequently litigated antitrust results of union activities, price-fixing or market allocation. The case before us presents another · classic antitrust problem—a concerted boycott of certain other businesses. Clearly, such behavior is also at the core of the behavior proscribed by the antitrust laws.[9]

Guided by my own reason, the change of statutory law, and the authority of both factions of the *Jewel Tea* majority,

---

ver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed. 2d 312 (1959).

8. As Judge Morgan points out, six judges in *Jewel Tea* held that there was no sustainable allegation of conspiracy with non-labor groups. The other three judges, spokesmaned by Mr. Justice Douglas would have found the requisite conspiracy in the collective bargaining agreement signed by the employers. Under that analysis this case too would involve a conspiracy if employers other than Connell had also agreed to boycott non-Local 100 subcontractors, since the contractors could not have agreed among themselves to boycott certain subcontractors any more than they could have agreed to fix prices or allocate markets. Thus the Douglas opinion in *Jewel Tea* would also find the agreement here within the scope of the Sherman Act if, as seems likely, other employers had also agreed to the boycott. Apparently Justice Douglas's opinion is predicated on the view that the union concern in marketing hours was not "immediate and direct"; there is no indication as to whether such concern is co-extensive with mandatory bargaining subjects.

9. *See, e. g.*, Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) ; Fashion Originators' Guild of America v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) ; Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914).

I would conclude that no absolute antitrust immunity necessarily extends to union activities which are forbidden by the statutes regulating labor-management relations. There is no justifiable reason to reflexively afford an antitrust exemption to conduct which Congress has expressly forbidden to labor organizations.[10] The secondary boycott prohibitions of the Labor-Management Relations Act, as amended by Labor-Management Reporting and Disclosure Act, were intended to prevent such a use of economic power directed towards neutral parties. When a union seeks to organize those who work for an employer or group of employers there can be no doubt that Congress has granted it freedom from antitrust proscription to act in concert against such employers in order to bring such employees as may be affected into a unified group of sufficient size to allow the union to deal on a par with management. Congress' balance of the competing interests, as I divine legislative intent, is calculated to produce union peer status, but not union dominance. Therefore, I would hold that where a union bypasses the congressionally sanctioned methods of organizing the employer whose employees it seeks to unite (here, the individual subcontractors) and illegally brings pressure on a neutral, secondary source of work for all such employers within an area (Connell) to force that unrelated economic entity to execute a contract which requires that all directly involved subcontractors bring their work forces into the membership of this local or starve for lack of work, then that union has passed beyond the scope of antitrust immunity.[11] It is incidental to the antitrust problem but cogent to the intent of labor policy that this creates an aggregation of power which not only exceeds any legitimate bargaining objective of a labor organization, but also carries the seed for internal destruction of the labor movement by creating super locals able to gobble up such contract opportunities to the exclusion of all others.

Moving completely out of the construction industry context so that my example will not depend upon any interpretation or application of the construction proviso, I would first give the following as an illustration of the restraint-of-trade potential of such activities which the majority declares to be immune from antitrust remedies. Suppose a Detroit-based local of the Teamsters Union was determined to control the employees of all of the truck lines hauling automobiles, could they engage free of any antitrust sanction in clearly illegal secondary picketing of the Big Three automakers and their component suppliers to secure a contract requiring the manufacturers to boycott all trucking companies not represented by the local? Or second, in terms of the case before us, could Local 100 go one step further and picket the manufacturing plants of any companies in its area who might intend to construct additional plants anywhere in the United States in order to force these Texas manufacturers to cease doing business with plumbing firms not organized by Local 100

---

10. Not all union misconduct constituting an unfair labor practice should entail a loss of union antitrust exemption; only that conduct which violates the congressionally-protected commercial rights of neutral parties would normally fall without the exemption. It is neither necessary nor appropriate for this dissent to attempt a complete catalogue of that labor law illegal conduct which falls without the exemption. Suffice it to say that since Section 8(e) is designed and intended to protect neutral parties from concerted boycotts required by union activity, a violation of that provision under circumstances similar to those here will place a union beyond the scope of the exemption.

11. The rule which I would follow may bear a superficial resemblance to Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), which *Apex Hosiery* declared to have been effectively overruled by the enactment of the Norris-LaGuardia Act. The critical distinction, however, is that the reasoning I favor draws its sustenance from the express declaration by Congress that secondary picketing is not a legitimate union tool, except where it is expressly permitted.

and to cease doing business with contractors who deal with such firms?

In the absence of clear precedent I would not embrace the proposition that patently illegal union activity must somehow be protected from antitrust proscription. Rather, I would hold that whenever a union crosses the line separating protected activities from prohibited activities it sheds its cloak of total antitrust immunity. Thus, I must reach the question the majority pretermits— the legality of the secondary activity.

*Labor Board Preemption*—The parties agree that the local's secondary economic coercion here, unless protected by the construction proviso of Section 8(e), is prohibited by Section 8(b)(4). While conceding that in the usual case the National Labor Relations Board should ordinarily be given the opportunity to make the first interpretation as to whether union conduct constitutes an unfair labor practice, I cannot accept the majority's proposition that a federal district court is absolutely barred from deciding the issue.

Of course, the Board has the power and authority to seek an injunction of union actions such as secondary picketing which constitutes an unfair labor practice. That the Board may do so, however, does not mean that the primary jurisdiction of the Board ousts completely the power of federal courts to adjudicate violations of antitrust laws committed to their jurisdiction because such violations also happen to be unfair labor practices.

Congressional policy certainly requires no such deference in all labor cases. For example, had this same case been brought as an action for damages under 29 U.S.C. § 187 (Section 303 of the Labor Management Relations Act), a specific grant of jurisdiction would require the same court to make the same determination that today is held to be forbidden.

Moreover, abatement of judicial proceedings pending Board action would be a futile gesture of comity in this case.

As Judge Morgan points out, the Board has apparently once resolved the Section 8(e) question adversely to the appellant's position. That determination was not reviewed by any circuit court. In a case almost identical to the one presented here (referred to by Judge Morgan as the K.A.S. case), the General Counsel refused to issue an unfair labor practice complaint. The plain meaning of this administrative history is that it did not require great prescience on Connell's part to anticipate that a resort to administrative remedies for this picketing would be ineffectual.

Justice White in *Jewel Tea*, unchallenged by any of the other opinions, clearly indicates that the primary jurisdiction doctrine is not to be woodenly applied to prevent court resolution of such issues in the antitrust context. Justice White relied in part on the fact that the Board's General Counsel, not the Board or a private litigant, will determine whether to issue an unfair labor practice complaint. He also pointed out the futility of requiring resort to "an expensive and merely delaying administrative proceeding when the case must eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agency." 381 U.S. at 686, 85 S.Ct. at 1600. In light of the General Counsel's established reluctance to submit the issue in this case to the Labor Board for resolution, and in view of the serious antitrust questions involved which are surely not within the scope of the Board's expertise, I would hold that this court and the district court below are not preempted from resolving the labor law problems in this antitrust action.

*Scope of the Construction Proviso*— Thus, I must reach the question my Brothers leave for another day: Is the union activity permitted by the construction proviso to Section 8(e)? All parties agree that the contract here is a secondary agreement generally prohibited by the main portion of Section 8(e); the only question is whether this con-

tract is excepted from that prohibition by the construction proviso portion of that section. The language of the relevant portion of that subsection, including the construction proviso is as follows:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, that nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work . . . .

On its face it would appear that the proper answer to this novel question of statutory interpretation would turn on whether Connell is to be deemed "an employer in the construction industry." Even assuming, however, that the language unambiguously includes Connell, such a mechanical parsing of the statute ignores the Supreme Court's admonition that such dictionary adjudication cannot obviate the need for judicial inquiry into Congressional purpose:

> It is a "familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers." . . . That principle has particular application in the construction of labor legislation which is "to a marked degree, the result of conflict and compromise between strong contending forces and deeply held views on the role of organized labor in the free economic life of

the Nation and the appropriate balance to be struck between the uncontrolled power of management and labor to further their respective interests." . . .

National Woodwork Mfrs. Ass'n v. N.L.R.B., 386 U.S. 612, 619, 87 S.Ct. 1250, 1255, 18 L.Ed.2d 357 (1967).

The difference between the traditional "hot cargo" clause entered into as a part of an established bargaining relationship and the one-shot, single-object contract presented here are substantial. First, and perhaps foremost, a general contractor in an established bargaining relationship has some economic power to resist the inclusion of a hot cargo clause in the collective bargaining agreement. Such a contractor can bargain over proposed clauses and possibly avoid their inclusion or require their modification by trading on some other point. Further, a strike in an established bargaining relationship is much more costly to the union than the relatively painless picketing utilized by the local in this case; here, since the local had no real interest in whether work on this project would ever be resumed, it probably could have maintained its pickets indefinitely. One other distinction between the union behavior here and the behavior which has been heretofore permitted under the Section 8(e) proviso is the much greater possibility of rival unions or locals seeking contradictory subcontracting contracts from the neutral general contractor.

What legislative history there is convinces me that Congress never intended to make legitimate hot cargo contracts between totally non-related parties or to condone the use of economic sanctions to compel such agreements. The limited exemption afforded to construction unions by the proviso

> was granted apparently in recognition of problems peculiar to the construction industry, particularly those resulting from sporadic work stoppages occasioned by the traditional refusal of craft unionists to work alongside non-union men on the same project.

Essex County and Vicinity Dist. Council of Carpenters v. N.L.R.B., 332 F.2d 636, 640 (3d Cir. 1964). The Supreme Court in *National Woodwork* cited the *Essex County* decision and stated:

[t]he construction proviso . . . was intended to be, a measure designed to allow agreements pertaining to certain secondary activities on the construction site because of the close community of interest there, but to ban secondary-objective agreements concerning nonjobsite work in which respect the construction industry is no different from any other.

386 U.S. at 638–639, 87 S.Ct. at 1265. The *Essex County-National Woodwork* rationale for the proviso—the community of interests at the construction site—will not support its application in the situation presented by the case at bar. Here there were no union laborers refusing to work alongside the nonunion plumbers. Such an objection was altogether impossible because the plumbers on this job were members of the union. The only statutorily related dissatisfaction of Local 100 here was the possibility that a firm employing nonunion plumbers might work on Connell's next job. This concern of the union plumbers—to extend their influence to other plumbing firms either not then employed or working on other projects—is not one related to the "close community of interest" on the construction site; rather, that concern is one "in which respect the construction industry is no different from any other."

Moreover, the proper interpretation of this proviso is dependent on a recognition that it was a compromise in order to preserve the established pattern of bargaining in the construction industry. *See National Woodwork, supra,* 386 U.S. at 637, 87 S.Ct. at 1265, and the legislative history there cited. This court requested supplemental briefs from all the parties and amici as to the pattern of bargaining practices utilized in the industry prior to the Landrum-Griffin amendments in 1959. In response to this specific inquiry the union was unable to point out any source of information which would show that subcontractor contracts such as the one in this case were even occasionally utilized in the industry prior to 1959, much less so common a practice that we could assume Congress intended to preserve that part of the pattern of collective bargaining in the industry.

In light of the total lack of any evidence to support the proposition that Congress intended to exempt this wide-ranging type of secondary behavior from the general rule, and considering the probable harm of extensive picketing of neutral parties by various, possibly rival, locals for the purpose of securing recognition of bargaining status from virtually all subcontractors in a given area, I feel compelled to reach the conclusion that this conduct is not protected by the proviso.[12]

## ON PETITION FOR REHEARING AND PETITION FOR REHEAR-EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

CLARK, Circuit Judge (dissenting):

I dissent from the refusal to grant rehearing for the reasons set forth in my dissent to the panel majority opinion.

---

12. No claim based on Section 8(b)(7) is presented here. *Compare* Building Construction Trades Council of Philadelphia, and Samuel E. Long, Inc., 201 NLRB No. 42 (1973).